**WESTRIC BATTERY COMPANY, a Colorado Corporation, Plaintiff-Appellee,**

v.

**STANDARD ELECTRIC CO., INC., a Texas Corporation, Defendant-Appellant.**

No. 74–1326.

United States Court of Appeals, Tenth Circuit.

Argued Jan. 20, 1975.

Decided Aug. 22, 1975.

Kenneth C. Groves, Denver, Colo., for plaintiff-appellee.

Reed L. Winbourn, of Zarlengo, Mott & Zarlengo, Denver, Colo. (Clemens, Weiss, Spencer & Welmaker, by Theo Weiss, San Antonio, Tex., on the brief), for defendant-appellant.

Before SETH, HOLLOWAY and DOYLE, Circuit Judges.

PER CURIAM.

Standard Electric, defendant in the trial court, seeks reversal of a judgment in favor of Westric Battery, which judgment is based on a jury verdict. Various items of damages were claimed and recovered on account of defective battery separators furnished by Standard Electric.

This is not our first encounter with the case. Our prior review occurred following a trial dating back to May 1972. On that occasion the jury had also found for the plaintiff and had awarded damages in the amount of $472,067.28. We affirmed that part of the judgment which imposed liability for breach of warranty. There was a remand for retrial of the damage issue alone. *See Westric Battery Co. v. Standard Electric Co.,* 482 F.2d 1307 (10th Cir. 1973). Westric had sought recovery for loss of future profits and for impairment of capital all in addition to out of pocket loss, past profits and cost of the defective separators. Our opinion recognized generally Westric's entitlement to out of pocket losses and net profits, but reversed because the jury had been allowed to speculate on future profits and to award damages for indirect consequences of defendant's acts. It was felt that there had been remoteness of damages, duplication in the award and excessiveness.

At the most recent trial Westric was allowed to amend its complaint so as to demand damage to its good will. The several items and the amounts awarded were:

| | |
|---|---:|
| Damages for direct costs and expenses | $112,705.71 |
| Damages for loss of profits | 64,804.00 |
| Damages for cost of separators | 18,953.00 |
| Damages for good will | 375,000.00 |
| TOTAL | $571,462.71 |

The main contention now to be dealt with is the $375,000.00 item for alleged loss of good will. Appellants, not unsurprisingly, say that this is plainly excessive and lacking in genuine support in the record.

Appellant's secondary contentions are the alleged allowance of out of pocket losses until March 31, 1972 and the exclusion of certain of the testimony and exhibits.

I.

In taking up the good will problem, we note our recognition in the prior opinion that good will has some potential in a case like the present one. As was said by the Supreme Court of Colorado: "Good will has long been accepted, and so treated, as an attribute of a business, trade or profession." *Lerner v. Stone,* 126 Colo. 589, 252 P.2d 533, 536 (1952). The Colorado court has not ruled in a context like the present one, but there is no dearth of authoritative support for damages arising out of injury to good will in breach of warranty occasioned by defective products.[1]

Although intangible (and not easy to prove),[2] good will is nonetheless real.

1. *Texsun Feed Yards, Inc. v. Ralston Purina Co.,* 447 F.2d 660 (5th Cir. 1971); *Barrett Co. v. Panther Rubber Mfg. Co.,* 24 F.2d 329 (1st Cir. 1928); *Isenberg v. Lemon,* 84 Ariz. 364, 329 P.2d 882 (1958); *Stott v. Johnston,* 36 Cal.2d 864, 229 P.2d 348 (1951); *Royal Paper Box Co. v. Munro & Church Co.,* 284 Mass. 446, 188 N.E. 223 (1933); *Swain v. Schieffelin,* 134 N.Y. 471, 31 N.E. 1025 (1892); D. Dobbs, Remedies 802 (1973); Annot., 28 A.L.R.2d 591 (1953). *Contra Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205 (3d Cir. 1970); *Allied Chemical Corp. v. Eubanks Industries,*

*Inc.,* 155 So.2d 740 (Fla.1963); *Krone Die Casting Co. v. Do-Ray Lamp Co.,* 297 Ill.App. 602, 18 N.E.2d 100 (1938).

2. The amount cannot and hence need not be proven with absolute precision. *See Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690 (5th Cir. 1975); *Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416 (10th Cir.), *cert. denied,* 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952); *H & H Products, Inc. v. Hughes,* 498 P.2d 965 (Colo.App.1972).

It is that which attaches to a business on account of name, location, reputation for competency and the imponderables which cause buyers to return.

■ Evidence by Westric to establish its loss consisted of testimony of Mr. Trombetta, vice president of another battery company. He testified to having considered purchase of Westric in 1968. Pursuant to this, he sent an employee to appraise it. Based on this appraisal, Trombetta concluded that Westric's good will had a value of from $250,000 to $500,000.

A second approach came from an expert, a Mr. Milliken, who calculated the value of Westric's good will in terms of the profits which it would have been expected to earn in addition to regular earnings had it not suffered injury as a result of appellee's faulty battery separators. These approaches have some support in the cases. *See Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690 (5th Cir. 1975); *Standard Oil Co. v. Moore,* 251 F.2d 188, 219 (9th Cir. 1957), *cert. denied,* 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958).

Although the law permits evidence of the kind we have outlined, this does not solve our problem. Thus, the trial court in its supplemental pretrial order permitted plaintiff to offer proof of damage to good will for all aspects of its business— not limited to the golf cart portion. This, however, assumed that other damages to good will were related to the defective golf cart separators.

At the first trial Westric claimed and proved only that the separators for golf cart batteries were defective. At the second trial this was expanded. Mr. Hill, the owner of Westric, testified that the Standard separators were also used in the commercial batteries and the top lines of their automotive batteries. These were the same type as the ones used in the golf cart batteries. Further evidence disclosed the existence of a high rate of complaints as to defects in the automotive batteries; the Westric reputation deteriorated in this area also.

The witness who testified to loss of good will in the automotive battery area did not testify that he knew anything about the golf cart battery failures. According to him, the loss of automotive battery good will all took place after 1968. By this time, according to Mr. Milliken's testimony, all of Westric's good will had dissipated.

■ In view of this time factor, we see no evidence whatever that Westric suffered good will loss in the automotive and commercial aspect of the battery business occasioned by failure of golf cart batteries. It necessarily follows that the jury's award of damages for loss of good will to the entire business is not well founded. We also have some doubts as to Mr. Trombetta's opinion in that it is based upon a hearsay report from an employee. There is a saving grace, and that is that Trombetta relied to a great extent on the location of the business; also on the fact that Mr. Hill personally had an excellent reputation for integrity and service which inured to the benefit of the business. Trombetta also was shown to have relied on the identity of the customers of Westric, some of whom were large wholesale distributors. Notwithstanding, though, that Trombetta's evidence becomes salient, we are unable to reconcile, assuming that Trombetta gave $500,000 value to good will, the fact that at least half of it was attributed to batteries other than for golf carts. The jury, as we have noted, awarded $375,000 total.

In view of the lack of connection of the auto battery good will to the main head of damage, the golf cart injury, we see no escape from the elimination of every semblance of automotive battery injury. We have pondered how to do this and have concluded that of the $375,000, if full value is given to the golf cart good will injury, an allowance of $250,000 would have some justification. Based on this, we have concluded that $125,000 must be eliminated and stricken from the good will award and that the judgment is to be amended accordingly.

## II.

Appellant complains that the award of $64,804 to cover loss of profits to the date of trial was invalid and excessive.

Our previous holding (in this case) was that the loss of net profits is recoverable if adequately proven. This proceeded from *Lee v. Durango Music,* 144 Colo. 270, 355 P.2d 1083 (1960) and *Lockwood Grader Corp. v. Bockhaus,* 129 Colo. 339, 270 P.2d 193 (1954), which cases stand for the rule that such losses resulting from the interruption of an established and a going business are recoverable. But this court ruled in the present context that profits are recoverable only to the extent that such profits result from conduct which hinders ability to produce. The upshot enunciated was that recovery for future profits beyond the trial date had to be considered remote since Westric's inability to produce (which was in law compensable) was temporary.

On retrial Westric sought damages for loss of good will and once again it sought $64,804 for loss of profits up to the time of the first trial. Mr. Maynard, Westric's expert, gave a value of $32,402 for loss of profits during 1969–70, and according to Mr. Hill, Westric's president, the company's ability to produce batteries was severely limited due to its preoccupation with repairing and replacing defective batteries to its customers. The expert witness, Mr. Milliken, testified to the same effect. As a result of this testimony, the amount claimed could be considered attributable to the impairment of Westric's ability to produce.

■ Westric goes one step further in seeking to obtain the entire sum of $64,-804. It has assumed that the $32,402.00 loss incurred in 1969–70 continued at the same rate in 1971–72. Simultaneously, Westric admits that the 1971–72 loss of sales was due to loss of reputation rather than inability to produce.[3] Clearly, then,

Westric in seeking lost profits for 1971–72 was in quest of compensation for loss of its reputation. Unquestionably this is duplication of recovery for loss of good will. *Cf. Larimer & Weld Irrigation Co. v. Landers,* 26 Colo.App. 1, 141 p. 517 (1914). It compels the conclusion that the verdict is excessive to the extent that the sum of $32,402 was awarded for loss of profits in the years 1971–72. The judgment must be modified so as to correct this ill founded award. The sum of $32,402 is to be subtracted from the amount allowed, namely, $64,804. The remaining sum will compensate Westric for profits lost in 1969–70 attributable to interference with Westric's normal operations occasioned by Standard's defective separator plates.

## III.

■ Appellant next challenges the award of $72,000 plus for credit memos which were issued by Westric through the fiscal year ending March 31, 1970. Its contention is that inasmuch as Westric ceased the use of the defective separators in August 1968, and since Westric was not required to replace batteries which failed 90 days after sale, many of these memos were unnecessarily issued.

Westric's response was:

1. That the entire amount was attributable to batteries which failed due to defective separators. (The accountant testified to a system of checks designed to ascertain the basis for the failure.)

2. Due to seasonal use of the batteries there was frequently a time lapse in the battery failure which extended long after 90 days even though there had not been 90 days of use. It is further pointed out by Westric that the warranty ran from 90 days of installation and not sale, a factor which also contributed to apparent extension of the period. And frequently Westric was unable to issue their credit memos with promptness.

**3.** Westric states in its brief that "Recoverability for loss of profits through fiscal 1972 is of course logical for the reason that direct losses prevented profits in the fiscal years 1969 and 1970, and the dramatic decline in customers prevented profits in fiscal 1971 and 1972."

Appellee's Brief, at 36. Westric's expert, Mr. Maynard, also testified that the reason that he extended his calculation of lost profits into 1971 and 1972 was because of the injury to Westric's reputation as a result of the defective batteries.

In view of these considerations, it must be held that there was sufficient evidence to support the jury verdicts on the issue of these credit memos.

■ A further sum in the amount of $39,000 was claimed by Westric based upon claims presented to it for defective batteries, but for which no credit memos were issued.[4] Appellant maintains that this sum is improper in the absence of credit memos to evidence the claims. The simple answer is, however, that Westric acknowledged this in writing and so they continue to be debts payable by Westric even though one type of acknowledgment was used rather than another.

■ On the question of cost of separators, the jury awarded $18,000 to Westric. There is an evidentiary dispute as to whether Westric actually paid this sum to Standard. There is evidence that Westric did make the payment and there is evidence that Westric did not pay it. It was for the jury to choose the version which it regarded as true. We cannot say that the award does not have support in the evidence.

## IV.

We have considered fully the several contentions of appellant as related to the exclusion of exhibits and testimony. We do not see necessity for discussing these in detail since it does not appear that the trial court abused its discretion in either receiving or excluding these exhibits.

■ Finally, appellant complains about the exclusion of Mr. Dershwin's testimony as an expert on behalf of appellant. It was shown by appellant that in 1969 General Battery Company considered buying Westric. Dershwin, who was then an executive of General Battery, checked out the Westric plant. Dershwin considered the building too small, the equipment inadequate and the inventory low. He did not recommend that General Battery make the purchase. The trial court allowed all of this testimony including Dershwin's testimony that he did not consider it a worthwhile acquisition. The court refused to allow Dershwin to testify that a reasonable businessman would have paid nothing for Westric either in 1967 or in 1969. The reason for excluding Dershwin's testimony was because it had not been tendered in compliance with the pretrial order in that reports had not been given 30 days before trial. This matter was within the discretion of the trial court also and we are not disposed to reverse the case on account of this exclusion.

It follows from what we have said that the judgment is to be modified in the respects indicated. The trial court is directed to reduce the damages for good will and the damages for lost profits in accordance with the directions contained in the body of the opinion. As the judgment is thus modified, it is affirmed.

---

4. The jury allowed only about $19,000 of these unissued credits.