**DRESSER INDUSTRIES, INC., WAUKESHA ENGINE DIVISION, Plaintiff–Appellee,**

v.

**The GRADALL COMPANY, Defendant–Appellant.**

**No. 91–1493.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 31, 1991.

Decided June 9, 1992.

Rehearing and Rehearing En Banc Denied July 10, 1992.

Jon P. Christiansen, Hollis E. Wright, Foley & Lardner, Milwaukee, Wis., Christopher Culver Pappas, Dunn, Kacal, Adams, Pappas & Law, Houston, Tex., for plaintiff-appellee.

John A. Rothstein, Quarles & Brady, Milwaukee, Wis., Michael L. Tinaglia, Michael M. Lorge, Brad A. Levin, David A. Shapiro, Bruce M. Friedman, Laser, Schostok, Kolman & Frank, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, COFFEY, Circuit Judge,\* and WISDOM, Senior Circuit Judge.\*\*

PER CURIAM.

In this diversity suit, Dresser Industries, Inc. ("Dresser") sued the Gradall Company ("Gradall") for breach of both oral and written contracts. A jury awarded Dresser damages of $582,000 and interest. Gradall appeals, alleging that the district court erred in denying its motion for summary judgment. Gradall also challenges the court's denial of its motion for a new trial or remittitur, its interpretation of Wisconsin's version of the Uniform Commercial Code, and its jury instructions. We affirm.

## I. BACKGROUND

### A. Facts

Beginning in 1982, Gradall manufactured and sold a small 4–wheel drive vehicle known as the 534B, primarily used in construction where its maneuverability makes it ideal for delivering materials to workers on a construction site. The 534B requires a 4–cylinder, turbo-charged diesel engine. Dresser made such an engine, called the VRD220S. From 1982 to 1985 Gradall bought VRD220S engines from Dresser for use in the 534B. When it ordered engines, Gradall mailed Dresser a purchase order, containing its (Gradall's) terms as to price, delivery date and location, quantity, and warranty coverage. The purchase orders stated that acceptance of the order would constitute an acceptance of all of Gradall's terms. Dresser then responded with an order acknowledgement which stated that it would accept Gradall's offer, but only on the condition that its (Dresser's) terms, as set forth in the order acknowledgement, would govern the transaction. Needless to say, Gradall's and Dresser's terms were quite different, especially as to the warranties applicable to Dresser's engines. Dresser's form disclaimed all implied warranties and limited its express warranty to one year, whereas Gradall's form included all implied warranties and called for a fifteen-month express warranty. Without attempting to resolve this discrepancy or decide whose warranty terms controlled, the parties acted as if a contract had been formed with Dresser shipping the engines and Gradall paying for them.

Beginning in 1983, many of Gradall's customers had problems with the Dresser engine in the 534B. Gradall referred the customers to Dresser's service centers, but the number of problems continued to increase and the service centers could not keep up with the requests for repair work. Finally, on April 18, 1985, company executives met to discuss possible solutions to the problems with the 534B and its engine. They agreed to a program known as the

---

\* Judge Coffey recused himself after oral argument. The two remaining judges on the panel issue this opinion.

\*\* The Hon. John Minor Wisdom, Senior Judge of the United States Court of Appeals for the Fifth Circuit, is sitting by designation.

"85–2 campaign." In this campaign, Gradall would repair problems unrelated to the engine, while Dresser would perform some engine work and sell Gradall new oil pump kits to replace faulty ones. The parties failed to agree on all the terms of the campaign, however. Dresser blamed Gradall for this failure, and, in hopes of forcing Gradall to agree to its terms, stopped delivering the oil pump kits. As a result, Gradall did not have the necessary parts to repair the engines in the field as originally contemplated under the campaign. By late 1985 Gradall decided that the 85–2 campaign was a failure, and that the only solution to the problem was to abandon the campaign and replace the Dresser engines with another company's engines, which it did.

### B. *Proceedings in the District Court*

Dresser sued Gradall, seeking payment of an outstanding balance for engine parts sold and delivered and a declaratory judgment as to the parties' contractual rights. Gradall answered with affirmative defenses and counterclaims. Its main affirmative defense was that Dresser's engines were defective from the start and that Dresser knew of these defects. Its counterclaims related to these allegedly defective engines, charging breach of express warranty, breach of the implied warranties of fitness and merchantability, breach of contract, negligence, both negligent and intentional misrepresentation, strict liability, and a right to punitive damages.

Dresser then filed a motion for summary judgment. For our purposes, the primary issue raised in this motion was whose warranty covered the engines. Dresser argued that its warranty applied, because Gradall passed it along to its customers and directed them to Dresser for engine repairs. Gradall countered that it had not adopted Dresser's warranty, and that because the parties' terms and written forms were in conflict, the contract was formed through their course of conduct, and the implied warranties of the Uniform Commercial Code ("U.C.C.") should govern. Wis.Stat. §§ 402.314 & 402.315. The court denied summary judgment on this issue,

finding that issues of fact remained as to whether Gradall adopted Dresser's warranty. Consequently, the jury would have to decide the issue by examining the parties' course of performance, course of dealing, and the custom and usage in the trade. *Dresser Industries, Inc., Waukesha Engine Division v. The Gradall Company*, 702 F.Supp. 726, 731–34 (E.D.Wis.1988). Thus, the Uniform Commercial Code's "gap-fillers," such as the implied warranties of merchantability and fitness for a particular purpose, would only become relevant if Gradall had not adopted Dresser's warranty by any of these means.

Dresser added a count to its complaint, claiming that Gradall breached the oral contract between the parties to carry out the 85–2 campaign. Gradall denied that there was an oral contract. It contended that the parties agreed to conduct simultaneous campaigns, but that Dresser's failure to ship the necessary parts made that impossible. As a result, it was forced to abandon the campaign and seek another way to satisfy its customers—namely, by replacing Dresser's engines with those of a competitor.

After trial, the jury held (1) that Gradall owed Dresser $113,154.12 plus interest for engine parts Dresser sold and delivered to it, (2) that Dresser substantially performed the oral agreement and that Gradall breached it, making Gradall liable for $582,000 plus interest, and (3) that Gradall's counterclaims were meritless. The district court denied Gradall's motions for a new trial, judgment notwithstanding the verdict, and remittitur.

## II. ISSUES

Gradall raises three issues on appeal. First, it challenges the sufficiency of the evidence supporting the jury's $582,000 verdict. In the alternative, Gradall contends the verdict was so excessive in relation to the evidence that it must have been the product of passion and prejudice. Second, Gradall argues that the trial court improperly allowed the jury to consider the course of performance, course of dealing,

and usage of trade to decide whether Gradall accepted Dresser's warranty. Gradall argues that once the court found that the parties documents had not formed a contract, § 2–207(3) dictates that neither party's warranty controls, and that missing terms of the contract are supplied by the U.C.C.'s gap-filling provisions. Finally, Gradall asserts that the jury instructions give the misleading impression that Gradall had the burden of proving that Dresser did not substantially perform the alleged oral contract.

## III. DISCUSSION

### A. *Damages*

Gradall's first claim is that the $582,000 damage award was excessive. In diversity cases, we apply the federal standard to determine whether a jury verdict is excessive, though our determination is guided by state standards where precedent exists. *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1554 (7th Cir.1990). In this circuit, we will alter jury awards only if they are "monstrously excessive, born of passion and prejudice, or not rationally connected to the evidence." *Id.; Matter of Innovative Construction Systems, Inc.*, 793 F.2d 875, 887 (7th Cir.1986). Because damage calculations are essentially an exercise in fact-finding, our review of the jury's damage award is deferential. Further, because the district judge denied Gradall's post-trial motions to erase or reduce the award, "we demand a particularly persuasive showing of excessiveness when the initial fact-finder—the jury—and the judge—who monitored the proceedings—agree that the award is appropriate." *Innovative Construction Systems*, 793 F.2d at 888.

Dresser sought damages for lost profits and harm to its reputation caused by Gradall's decision to replace its engines. Gradall contends that the evidence of lost profits, at best, could support an award of $261,000, because that is the only evidence of loss and is the amount Dresser's attorney asked for at closing argument. It argues that there is no rational connection between this evidence and the jury's award of $582,000. Further, Gradall argues that

the "extra" $321,000 cannot be upheld as compensation to Dresser for damage to its business reputation because the evidence on this point was minimal and vague. In addition, Gradall argues that reputation damages are not available in contract cases. Finally, Gradall contends that the award was so large that it must have been the result of the jury's passion and prejudice, necessitating a new trial on the merits. We address each argument separately.

### 1. Lost Profits

■ Dresser's main contention with regard to the oral contract was that Gradall's breach caused it to lose future profits, which would have derived from the sale of spare parts and repairs to the engines after the expiration of the warranty period. Testimony on this point came from Richard Davis, Dresser's Director of Service Operations.

Q: From your experience can you tell me how much money Waukesha [Dresser] makes per engine per year for parts sales on VRD220S engines?

A: Each engine would consume approximately $1,000 worth of spare parts annually.

Q: Gradall has contended in this case they removed some 290–plus engines, Waukesha engines, and replaced them with Perkins [engines]. Now, if those engines were indeed traded out and Perkins engines were replaced, would Waukesha lose the parts business on those engines had they continued operating?

A: Yes.

Q: What was Waukesha's profit margin from your experience as the director of service for parts sales on VRD220S, on the average?

A: 30 to 40 percent.

Q: Now if we take 30 percent times 290 engines times $1,000 per year times 3 years, I get $264,600. Does my math sound correct to you?

A: Yes, sir.

Tr. 342–44. After realizing that the proposed calculation totalled only $261,000,

Dresser's counsel requested during closing argument that the jury return a verdict for that amount.

As noted above, a damage award must bear some rational connection to the evidence. *See Cygnar v. City of Chicago*, 865 F.2d 827, 848 (7th Cir.1989). This is especially true when a plaintiff seeks lost profits, which must be supported by credible evidence and not based upon mere guesswork or speculation. *Wisconsin Liquor Co. v. Park & Tilford Distillers Corp.*, 267 F.2d 928, 932 (7th Cir.1959). Credible evidence supports $261,000 of the award. Davis was an experienced Director of Service Operations (nearly ten years on the job) and knew what profits could be expected from the VRD220S engine. Gradall argues that there is no evidence to support the remaining $321,000, and thus it must be remitted. Dresser, in turn, argues that Davis's testimony was a *conservative* estimate, and that the jury could reasonably find that the damages were greater than alleged. For example, the $261,000 figure was based on a thirty percent profit margin, though Davis testified that the range was thirty to forty percent. Similarly, Davis said that the engines had a three-year parts life and estimated damages on this basis. He also stated, however, that the engines were likely to be overhauled after a few years. Overhaul extends the life of an engine and, therefore, the period of time when Dresser would profit from spare parts sales. When considering this evidence, Dresser contends, the jury logically might have concluded that the engines would last five years and that the profit margin would be forty percent. Plugging these figures into the equation, the jury would have calculated a damage total of $580,000 ($1,000 in parts per year × 5 years × 290 engines × .40 = $580,-000), an amount quite close to the actual award.

Of course, we do not know for sure whether the jury *actually* made such calculations, but a jury has wide discretion in determining damages, so long as it has a reasonable basis. *See Redepenning v. Dore*, 56 Wis.2d 129, 201 N.W.2d 580, 584 (1972) (jury may award compensation for amounts reasonably supported by the evidence). And even though the amount of Dresser's award may appear to be generous, we will not interfere with the jury's weighing of the evidence and estimate of Dresser's lost profits. *Cf. Milwaukee Rescue Mission, Inc. v. Redevelopment Authority of Milwaukee*, 161 Wis.2d 472, 468 N.W.2d 663, 669–70 (1991) (jury could award more than expert's estimate of damages). This is especially so where the trial judge, who had the opportunity to hear the evidence and observe the jury, has seen fit to uphold the award in the face of a post-trial challenge. *Innovative Construction Systems*, 793 F.2d at 888.

### 2. Damage to Goodwill or Business Reputation

During the trial, Dresser attempted to prove that its business reputation was damaged by Gradall's breach of the oral contract to perform the 85–2 campaign. Its primary witness on this point was Ben Stuart, Dresser's vice president of operations. Stuart made two passing references to possible damage to Dresser's reputation.

Q: Was it clear at this point that suit would have to be, that we'd have to have a lawsuit between the parties?

A: ... [T]hey were telling us that we weren't going to have a chance to fix these engines, that they just unilaterally decided to change them out to another engine, which, of course, was hurting our reputation. It meant that the users that had the [Dresser] engine weren't going to have an engine, or at least a [Dresser] engine that would perform the way they wanted it.

Tr. at 2014.

Q: Mr. Stuart, you also mentioned this morning that you felt that Gradall's decision had hurt the reputation of Dresser; is that correct?

A: Yes. Of Waukesha, their decision to replace the engines rather than allow us to repair them properly.

Q: And that was because of the failures that Gradall was experiencing on its— on your engines in its vehicles, correct?

A: Well, the part about the reputation is that they didn't allow us to fix the problems and they just made an arrangement to change them out.

Tr. at 2077. Dresser's counsel referred to this testimony in his closing argument when describing the damages caused by Gradall's breach.

In denying Gradall's post-trial motion for a remittitur of the damages, the district court stated that the $582,000 award was justified, even though Dresser only asked for $261,000 in lost profits. The "extra" $321,000 could be attributed, at least in part, to reputation damage. The district court noted that although such damage is difficult to quantify, it was justified in this case because both parties sought millions of dollars in damages. Gradall contends that reputation damages are not available in contract actions and, even if they were, the evidence in this case did not support such a large award.

■ Because this is a diversity case, we apply Wisconsin law. The Wisconsin Supreme Court has held that reputation damages are not available in contract cases. *Smith v. Beloit Corp.*, 40 Wis.2d 550, 162 N.W.2d 585 (1968) (damages for harm to fired employee's reputation not recoverable in employment contract case because such damages are too speculative); *see also Mursch v. Van Dorn Co.*, 627 F.Supp. 1310, 1317 (W.D.Wis.1986); *O'Leary v. Sterling Extruder Corp.*, 533 F.Supp. 1205, 1210 (E.D.Wis.1982). We need not decide whether Wisconsin would apply this rule in cases involving contracts other than employment contracts, however, because Gradall failed to request a jury instruction forbidding reputation damages. Further, its argument to this court that such damages are not recoverable consists of no more than a footnote. *See* Appellant's Brief at 27, n. 2. Arguments not made in the trial court nor adequately presented to this court are waived. *See United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989), and cases cited therein.

■ The question, then, is whether the evidence presented could justify an award for reputation damages as a result of Gra-

dall's breach of the contract. We hold it cannot. Where allowed, an award for damage to goodwill or business reputation must be supported by specific evidence. *See Roundhouse v. Owens*, 604 F.2d 990, 995 (6th Cir.1979), though it need not be proven with absolute precision. *Westric Battery Co. v. Standard Electric Co., Inc.*, 522 F.2d 986, 987 n. 2 (10th Cir.1975). Such evidence might come through expert testimony, such as before-and-after appraisals of the value of the plaintiff's business. *See Westric Battery*, 522 F.2d at 987–88. In this case, however, the only evidence of damage to Dresser's reputation was Stuart's unsupported statement that Gradall's action harmed Dresser's reputation. Mere self-serving testimony is not enough to prove damage to a plaintiff's goodwill. Stuart did not even venture to put a dollar figure on Dresser's loss, much less support his testimony with concrete evidence. This is insufficient evidence to support an award of over $300,000.

■ Nevertheless, the award will stand despite the district court and Dresser's attempt to support it with an incorrect or improper theory (reputation damages). The evidence of lost profits, alone, gave the jury a rational basis for awarding $582,000 and, as noted above, we will not interfere with this legitimate exercise of discretion.

3. Passion and Prejudice

■ Alternatively, Gradall argues that it is entitled to a new trial because the award here is so large that it must have been the product of passion and prejudice. Unquestionably, a new trial, and not remittitur, is required when an award is the result of passion and prejudice, because the prejudice may have infected the verdict itself. *Minneapolis, St. Paul & Sault Ste. Marie Railroad v. Moquin*, 283 U.S. 520, 51 S.Ct. 501, 75 L.Ed. 1243 (1931); *Dorin v. Equitable Assurance Society of the United States*, 382 F.2d 73, 77 (7th Cir.1967). Gradall's theory, however, is that passion and prejudice may be inferred from the size of the award, an unclear proposition. In the Fifth Circuit, prejudice can be inferred from size alone. Older cases from this

circuit, however, seem to reject that idea. *Compare Wells v. Dallas Independent School District*, 793 F.2d 679, 684 (5th Cir.1986) (size of verdict alone sufficient to infer passion and prejudice), *with Bucher v. Krause*, 200 F.2d 576, 586 (7th Cir.1952) and *Wetherbee v. Elgin, Joliet & Eastern Ry. Co.*, 191 F.2d 302, 308–09 (7th Cir. 1951). We need not decide which rule to follow today, though. Having ruled that the damages here were rationally connected to the evidence, it would be internally inconsistent to turn around and find passion and prejudice. In other words, a finding that damages were not monstrously excessive or unsupported by the evidence necessarily precludes a finding of passion and prejudice. We therefore hold that there was no passion and prejudice here.

**B.** *Wis.Stat. § 402.207(3): The "Battle of the Forms" and the Meaning of "Supplementary Terms"*

In ruling on Dresser's motion for summary judgment, the district court refused to decide whether Gradall accepted Dresser's warranty. The problem arose because Gradall's purchase orders stated that acceptance of the offer would be limited by the terms and conditions in that form, including the warranty. Dresser's order acknowledgement, on the other hand, stated that Dresser's acceptance of Gradall's order was expressly conditioned on Gradall's agreement that the terms of Dresser's form would control. *Dresser Industries*, 702 F.Supp. at 729. Despite the conflict in the terms and warranties,[1] the parties performed for an extended period, without determining which terms actually controlled. The issue of which warranty controlled became important during litigation because Dresser's warranty, if applicable, had a shorter limitations period that would bar four of Gradall's counterclaims.

 When a party sends a written offer that makes acceptance of the agreement subject to its terms, and the offeree responds with a form making its acceptance expressly conditional on assent to its new or different terms, no contract is formed unless the offeror accepts the offeree's terms. *Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1443 (9th Cir.1986). If, without the offeror's acceptance of the offeree's terms, the parties nevertheless act as if a contract has been formed, the terms of their agreement are determined by § 2–207(3) of the U.C.C., as set forth in Wisconsin Statute § 402.-207(3). Section 402.207(3) provides:

> Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such a case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of chs. 401 to 409.

The district court found that this section applied because the writings of the parties did not establish a contract, but their conduct did. 702 F.Supp. at 732. Thus, the terms of the contract between Dresser and Gradall would be those on which their writings agreed, and "any other supplemental terms" provided by the U.C.C. *Id.* at 733. Dresser argued that its warranty had become a "supplementary term" because, under U.C.C. §§ 1–205 and 2–208 (Wis.Stat. §§ 401.205 & 402.208), it became part of the contract as a result of the parties' course of performance (§ 2–208), course of dealing (§ 1–205), and usage of trade (§ 1–205). Although the district court refused to grant summary judgment on this theory, it noted that the jury could weigh the evidence on these points at trial.

> [T]he court finds that summary judgment is precluded on the issue of whether the conduct of the parties evidenced

---

**1.** Gradall's Purchase Order provided for a minimum fifteen-month warranty and required Dresser's engines to be generally merchantable and free of design defects. It also gave Gradall the right to recover on any express or implied warranties. Dresser's Order Acknowledgement, in contrast, provided for a one-year warranty, and only guaranteed that the engines would meet Gradall's specific needs and be free of design defects. It disclaimed all other express or implied warranties. *See Dresser*, 702 F.Supp. at 729–30.

an acceptance of the terms of the Waukesha warranty through the various methods proposed by Waukesha. If no acceptance to the terms existed through these methods, the Waukesha warranty, with its time limitations on claims, would not apply and the UCC's gap fillers would be used. *See* Wis.Stat. §§ 402.-313–402.314.

702 F.Supp. at 734.

Gradall argues that this holding, and the subsequent jury instruction directing the jurors to determine whether Dresser's warranty became part of the contract through course of performance, course of dealing, or usage of trade, was legally erroneous. Rather, Gradall claims, once the court decided that § 402.207(3) applied, it should have looked to the standardized gap-filling provisions of the U.C.C. to determine what "supplementary terms" were part of the contract. These include the implied warranties of merchantability and fitness for a particular purpose provisions. *See* Wis. Stat. §§ 402.314 and 402.315. According to Gradall, only such gap fillers can serve as "supplementary terms" under § 2–207(3).

■ Dresser initially argues that Gradall waived its claim by failing to object to the jury instruction that directed the jury to consider course of performance, etc., in deciding whether Dresser's warranty became part of the agreement. Federal Rule of Civil Procedure 51 requires a party to object to a jury instruction before the jury retires in order properly to challenge that instruction on appeal. Gradall failed to do so, but contends that this is not fatal to its claim because it made the same argument in its response to Dresser's motion for summary judgment, giving the court clear notice of its position. When the court rejected its position, Gradall's argument continues, it was clear that any further objection would be futile, and was therefore unnecessary to preserve the claim for review. *See* 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2553, at 639–640 (1971).

The general rule is that "[t]he failure to object [to a jury instruction] may be disregarded if the party's position had previously been clearly made to the court and it is plain that a further objection would be unavailing." *Id.* at 640. A position is "clearly made" when the party states it with "sufficient clarity that the trial judge may see what [the grounds for the position are] and follow them if well taken." *Id.,* § 2554, at 643 (discussing objections to jury instructions under Rule 51). Gradall made its position clear when it opposed Dresser's motion for summary judgment, devoting three pages to it in its memorandum opposing the motion. Though the court denied Dresser's motion, it also rejected Gradall's theory as to the meaning of "supplementary terms." In light of this decision, Gradall certainly had reason to believe that it would be pointless to press its theory further, and was permitted to wait for a final decision on all the issues in the case before appealing the interlocutory summary judgment decision. *See Johnson v. Burken,* 930 F.2d 1202, 1207 (7th Cir.1991) (when a judge makes an interlocutory ruling on a summary judgment motion, it is not appealable until the end of the case). Thus, Gradall has not waived its claim as to the proper interpretation of § 2–207(3).

■ We come now to the most academic issue in the case: Does the phrase "supplementary terms" in § 2–207(3) include only those terms expressly provided by the U.C.C. (e.g., the implied warranties of merchantability and fitness for a particular purpose) as Gradall contends, or does it also include terms that may be implied from the parties' course of performance, course of dealing, and usage of trade?

In arguing that only the Code's gap-fillers may serve as "supplementary terms" Gradall relies on our interpretation of New York's version of § 2–207(3). *C. Itoh & Co. v. Jordan International Co.,* 552 F.2d 1228 (7th Cir.1977). In *C. Itoh,* as here, the parties' writings did not form a contract but their conduct did, forcing the court to rely on § 2–207(3) to determine the contract's terms. The key issue was whether an arbitration clause in the defendant's form could be brought into the contract as a "supplemental term" even though it conflicted with the terms of the

plaintiff's form. The court held that it could not, finding that any terms on which the parties did not agree had to be discarded, and that all "supplementary terms" must come from the U.C.C.'s gap-filling provisions.

We are persuaded, however, that the disputed additional terms (i.e., those terms on which the writings of the parties do not agree) which are necessarily excluded from a Section (3) contract by the language, "terms on which the writings of the parties agree," cannot be brought back into the contract under the guise of "supplementary terms."

\* \* \* \* \* \*

Accordingly, we find that the "supplementary terms" contemplated by Section 2–207(3) *are limited to those supplied by the standardized "gap-filler" provisions of Article Two.*

552 F.2d at 1237 (emphasis added).

Other courts, however, have read § 2–207(3) differently. The Tenth Circuit takes a more liberal approach, interpreting § 2–207's reference to "supplementary terms incorporated under any other provisions of this Act" as encompassing those terms arrived at through the course of performance, course of dealing, or usage of trade, as well as the Code's stock gap-fillers. *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1579 (10th Cir.1984).

Leading U.C.C. commentators also disagree on the meaning of "supplementary terms" in § 2–207(3). Professor Hawkland believes that the parties' course of conduct should be considered in cases involving § 2–207(3). 2 W. Hawkland, *Uniform Commercial Code Series*, § 2–207:04, at 109–110 (1990) (discussing warranties). Professors White and Summers, in contrast, would limit "supplementary terms" to those expressly provided for in the Code's gap-fillers. *See* 1 J. White & R. Summers, *Uniform Commercial Code*, § 1–3, at 45 (3d ed. 1988).

We believe that Wisconsin's version of § 2–207(3) is most amenable to the approach taken by Professor Hawkland and the Tenth Circuit in *Daitom*. That section directs us to fill out a "battle of the forms" contract with "supplementary terms incorporated *under any other provisions of chs. 401 to 409."* Wis.Stat. § 402.207(3) (emphasis added). Thus, a court is not limited to the standardized gap-fillers of Article 2, but may utilize any terms arising under the entire U.C.C. The statute's reference to "any other provisions," therefore, necessarily encompasses those sections relating to course of performance (§ 402.208) and course of dealing and usage of trade (§ 401.205). This is the most natural reading of the statute. There is no reason to suppose that the legislature would have used the word "any" if it really meant only the usual gap-fillers. This is not to say that the gap-fillers are unimportant; in cases where the parties' performance gives no indication of their understanding of a particular term, the gap-fillers will supply it. We simply hold that, under Wisconsin law, all of the U.C.C.'s provisions should be used in discerning the terms of a contract under § 2–207(3), including those provisions that allow us to examine the parties' performance.

The instant case is distinguishable from *C. Itoh* because in that case we did not directly confront the issue of whether the parties' course of performance, course of dealing, and usage of trade could be considered under § 2–207(3). Apparently, neither party raised the issue, as the provision in question was an arbitration clause, and there was no opportunity to arbitrate. In these circumstances it was necessary to rely on the Code's gap-fillers. Dresser, in contrast, has raised the issue of the applicability of §§ 2–208 and 1–205, and there has been some activity relating to the terms in question.[2] Further, at the end of its opinion, the *C. Itoh* court recognized the possibility that in a simple diversity case

---

**2.** Dresser shipped the warranty with its engines, so Gradall was aware of its contents. Further, Gradall passed the warranty along to its customers, who had repairs done according to the warranty's terms. Finally, there was some evidence that the custom in the industry was for the manufacturer of a finished product (here, Gradall) to adopt the warranties of the companies who sold them parts (here, Dresser).

**1452**

(as here) a strong argument exists that custom and usage could be relied upon to supply a supplementary term. It did not resolve the question, however, because the case involved the Federal Arbitration Act, which requires that arbitration clauses be in writing before a stay can issue. Because the parties' forms did not agree on the arbitration issue, there was no writing. Nevertheless, the court's discussion of the issue indicates that it did not intend to rule out the possibility that §§ 2–208 and 1–205 could be used to discern the terms of a § 2–207 contract; it simply responded to the facts before it. Our decision today takes up where *C. Itoh* left off, and we accordingly give a broader interpretation to the meaning of "supplementary terms." Thus, the district court acted appropriately in allowing the jury to consider the parties' course of performance, course of dealing, and usage in the trade in deciding whether Dresser's warranty became part of the contract under § 2–207(3).

## C. *Burden of Proof Instruction*

 Gradall's final claim relates to another jury instruction; actually, two of them. First, the general burden of proof instruction stated: "[E]ach party asserting a claim has the burden of proving each essential element of his claim by a preponderance of the evidence." Later in the instructions the court addressed the issue of the oral contract.

> Waukesha [Dresser] contends that in April 1985, Waukesha and Dresser entered into an oral contract to implement a campaign to service the 534B. Gradall contends that there was no such oral agreement or that if there was, Waukesha did not substantially perform the terms of the oral agreement.

Gradall maintains that when the court stated "Gradall contends that ... Waukesha did not substantially perform" after previously instructing the jury that a party asserting a claim has the burden of proving it, the court instructed the jury that Gra-

dall, rather than Dresser, had the burden of proof on the substantial performance issue.

In reviewing a challenge to a jury instruction, we examine the instructions as a whole, and "[a]s long as the instructions treat the issues fairly and adequately, they will not be interfered with on appeal." *United States v. Machi,* 811 F.2d 991, 1005 (7th Cir.1987); *Bassett v. Local Union No. 705,* 908 F.2d 218 (7th Cir.1990). Here the instructions that Gradall juxtaposes were actually four pages apart in the copy given to the jury. Although the instructions might have been worded more clearly, we find that their spatial separation and their failure to specifically refer to Gradall's non-performance argument as a "claim" indicates that the jury was not misled and that Gradall was not prejudiced.

### IV.

For the foregoing reasons, the judgment of the district court is

Affirmed.

### ORDER

On consideration of the petition for rehearing with suggestion for rehearing en banc filed by the defendant-appellant, no judge in active service has requested a vote thereon, and a majority * of the judges on the original panel have voted to deny the petition.

It is hereby ordered that the aforesaid petition for rehearing and suggestion for rehearing en banc be and the same is hereby DENIED.

---

* Judge Wisdom did not participate in the consideration of the suggestion for rehearing en banc. Judge Coffey did not participate in the consideration of the petition for rehearing or the suggestion for rehearing en banc.