**TITANIUM METALS CORPORATION, a Delaware corporation, Plaintiff,**

v.

**ELKEM MANAGEMENT, INC., a Pennsylvania Corporation, Defendant.**

No. Civ.A. 97–369.

United States District Court, W.D. Pennsylvania, Pittsburgh Division.

*Nov. 5, 1998.*

David E. White, Leonard F. Spagnolo, Thorp, Reed & Armstrong, Pittsburgh, PA, Lester C. Houtz, Ryan D. Downs, Bartlit, Beck, Herman, Palenchar & Scott, Denver, CO, for Titanium Metals Corporation, a Delaware corporation, plaintiff.

Edward G. O'Connor, Scott D. Cessar, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, for Elkem Management, Inc., a Pennsylvania corporation dba Elkem Metals Company, defendant.

## MEMORANDUM OPINION AND ORDER

D. BROOKS SMITH, District Judge.

Presently before the court are defendant's motion for partial summary judgment dismissing plaintiff's indemnity claim, dkt. no. 26, and defendant's motion to strike changes to deposition testimony, dkt. no. 28. I will deny both motions.

### I.

To place these motions in context, I will restate my recitation of the facts from my memorandum opinion of September 30, 1998, dkt. no. 37. Timet manufactures titanium alloys for the aerospace industry in discrete batches known as "heats." One component of those alloys is chromium, which Elkem sells. Timet contracted with Elkem to provide chromium powder for Timet's heats. Because Elkem's plant produces that metal only in 2.5″ pellets, it contracted with F.W. Winter & Co., Inc., to crush and screen the pellets into a powdered form acceptable to Timet. Unfortunately for all concerned, Winter screened the chromium powder on equipment it had previously used to screen tungsten carbide for another of its customers. Tungsten is considered a contaminant of titanium alloys.

Timet used the contaminated chromium in several heats and sold the resulting alloy to its customer, Wyman–Gordon Company, which in turn made forgings from it and sold them to its largest customer, General Electric, for use in military jet engines. When the mistake was discovered, the result was predictable: GE demanded compensation from Wyman–Gordon and was given $4.5 million, and Wyman–Gordon sought and received $2 million from Timet. Timet then filed the instant suit against Elkem, alleging breach of contract, and breach of express warranty, breach of the implied warranties of merchantability and fitness. The complaint seeks recovery of the $2 million that Timet paid Wyman–Gordon, $465,824 for replacement of defective metal and $189,145 in testing, inspection and investigation costs it incurred in determining the source of the contamination.

On September 30, 1998, I granted partial summary judgment to defendant on the limited issue of direct recovery for the cost of replacing metal sold in 1992, but denied it in all other respects. Dkt. no. 37. I did not rule at that time on defendant's remaining two motions, and will do so now.

## II.

The focus of defendant's instant partial summary judgment motion is that, even when stated as an indemnity claim, plaintiff's recovery for the $2 million it paid to Wyman–Gordon is barred according to the usage of trade in the metals industry. Specifically, the contention is that Elkem cannot be liable to Timet in indemnity because, notwithstanding its payment in settlement, Timet was never liable to Wyman–Gordon. This is a "battle of the forms" question under section 2–207 of the UCC, with the point of contention being whether usage of trade or the Code's own gap-fillers provide the appropriate rule.

Stated briefly, the reverse side of Wyman–Gordon's purchase order provides that the seller, in this case Timet, agrees to indemnify Wyman–Gordon from all claims arising from the use of the product it supplied. Timet's acknowledgment, on the other hand, provides that there shall be no liability for consequential damages, including those arising from the claims of third parties. Both forms also convey the party's insistence upon its own terms and its objection to any conflicting terms of the other party. As the parties agree, under the "knock-out" rule expressed in UCC § 2–207(2), neither of the dueling terms became a part of the contract. Dkt. no. 27, at 8; dkt. no. 34, at 3; *see Daitom, Inc. v. Pennwalt Corp.,* 741 F.2d 1569, 1579 (10th Cir.1984); *Westinghouse Elec. Corp. v. Nielsons,* 647 F.Supp. 896, 900–01 (D.Colo. 1986).

Thus, the question becomes, what terms shall the parties be judicially held to have agreed to? Under the UCC's "gap-filler" provision, § 2–207(3), when there is "[c]onduct by both parties which recognizes the existence of a contract[,]" a contract exists and "consist[s] of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title." Elkem argues that, under UCC § 2–202(a), the agreement may be supplemented "by course of dealing or usage of trade. . . ." *Id.* Timet, on the other hand, relies on explicit gap fillers found in sections 2–714 and 2–715, which allow consequential damages to be re-

covered "[i]n a proper case. . . ." UCC 2–714. It argues that trade usage is relevant only when interpreting an ambiguous writing, not when supplying a term the parties have omitted entirely. Neither party has cited any case authority explicitly holding that usage of trade either can or cannot be used as a gap-filler.

■ I conclude that usage of trade, if proven, is a valid gap-filler under UCC § 2–207(3). In *Dresser Indus., Inc. v. Gradall Co.,* 965 F.2d 1442 (7th Cir.1992) (per curiam), the court dealt with a situation in which "the writings of the parties did not establish a contract, but their conduct did." *Id.* at 1449. The district court held that, while defendant's warranty did not expressly become part of the contract, it was incorporated into it as a supplemental term based upon its status as, *inter alia,* a usage of trade. *Id.* The Seventh Circuit affirmed, mentioning the Tenth Circuit's view, expressed in dicta in *Daitom,* 741 F.2d at 1759, that a § 2–207(3) contract includes trade usage as well as other gap fillers. 965 F.2d at 1451. The court then opined that this holding was consistent with the positions of the leading UCC commentators. It concluded:

> [A] court is not limited to the standardized gap-fillers of Article 2, but may utilize any terms arising under the entire U.C.C. . . . This is the most natural reading of the statute. . . . This is not to say that the gap-fillers are unimportant; in cases where the parties' performance gives no understanding of a particular term, the gap-fillers will supply it. We simply hold that . . . all of the U.C.C.'s provisions should be used in discerning the terms of a contract under § 2–207(3), including those provisions that allow us to examine the parties' performance.

*Id.; accord* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* §§ 3.3, at 119, 3.4, at 125 (4th ed.1995); John E. Murray, Jr., *Murray on Contracts* § 89, at 430 (3d ed.1990) ("trade usage . . . may be seen as supplying terms in the agreement of the parties[,]" not merely as an aid to the interpretation of ambiguous contract language).

This view is also consistent with common sense. UCC § 1–205(d) sets forth a hierarchy when applying course of dealing and usage of trade. First, express terms are deemed controlling, then course of dealing, then finally usage of trade. When express terms exist, we know what the parties intended; beyond that, it is more plausible to look to how *these* parties have dealt in the past than it is to look at the practices of an entire industry. Likewise, in the instant situation, it is more helpful to look at trade usage within a single industry, in determining what reasonable parties would have intended, than it is to look to commercial practices in the United States as a whole. Timet and Wyman–Gordon are simply more likely to have intended to follow the practice of the metals industry than the practice of, for example, grain merchants and automobile parts wholesalers.

■ That having been said, this record will not support an entry of summary judgment in Elkem's favor because they have not proved, as a matter of undisputed fact, that the trade usage in the metals industry limits recovery only to replacement cost and does not include consequential damages.

It is true, of course, that Elkem has adduced evidence that industry practice was to limit claims to the replacement of raw metal only. For example, Wyman–Gordon: (1) entered into another contract with GE in 1986 providing that the seller's obligation was solely to repair or replace defective metal; (2) exchanged correspondence with GE in 1994 in response to GE's claim, stating that in accordance with past practice, Wyman–Gordon would replace any defective forging; (3) exchanged further correspondence in which it expressed what it believed to be the established practice of not accepting liability for consequential damages in the metals industry; prepared talking points for use by its president in settlement negotiations expressing the same position; and (5) stated in the settlement agreement that, according to custom and usage in the industry, Wyman–Gordon was not legally responsible for consequential damages. There is also evidence that Timet's Vice President of Sales, John Monahan, believed that industry practice was

limited to replacing defective metal and that any departure from that practice would set a new precedent.

On the other hand, Timet points out that every injured party in the entire manufacturing chain sued its supplier for consequential damages. Parties settled these claims, indicating that none of them believed that their liability was capped at replacement cost. Timet also assails much of Elkem's evidence that Wyman–Gordon asserted it was not liable for consequential damages. Like any party facing litigation, Timet argues, Wyman–Gordon engaged in posturing over the issue of industry custom, which simply does not prove—at least not conclusively—that its position had the force of trade usage. Indeed, the fact that Wyman–Gordon memorialized its understanding of limited liability in a 1986 writing could be seen as indicating that it thought it *would* have been liable for consequential damages otherwise.

At this stage, I am compelled to conclude that the parties have argued a disputed issue of material fact. I am not satisfied that Elkem has proved the existence of its alleged usage of trade. The finder of fact, after considering the exhibits and hearing live testimony, will have to determine whether limitation of liability to replacement cost constituted a trade usage in the metals industry.

### III.

Also remaining for disposition is defendant's motion to strike changes to deposition testimony, dkt. no. 28. In this motion, Elkem argues that Timet improperly changed the substance of one of its witness' testimony under the guise of making typographical corrections to the deposition transcript.

On December 9, 1997, Elkem took the deposition of Timet employee Paul Allen pursuant to Fed.R.Civ.P. 30(b)(6), questioning him about Timet's investigation of the titanium contamination. Allen testified that the mass balance of the chromium not used in production was 1,359 pounds, a figure at variance with Timet's claim that 1,500 pounds remained and was sent to a laboratory for testing. According to Elkem, this mass difference calls into question precisely what ma-

terial was sent out for testing, and, therefore, the results of that analysis.

On January 2, 1998, Allen submitted corrections to his deposition testimony, including a thirty page attachment containing one page of explanation, a one-page computer spreadsheet and 28 pages of documents. There, Allen concluded that the correct mass balance was indeed 1,500 pounds after all. Defendant seeks to have these "corrections" stricken.

Defendant argues that the changes are untimely under Fed.R.Civ.P. 30(e), which sets forth a thirty day limit, having been filed some 47 days after Allen received the transcript. It also asserts that corrections to deposition testimony are not intended to allow a deponent to materially change what he said under oath, citing *Greenway v. International Paper Co.*, 144 F.R.D. 322, 325 (W.D.La.1992). I cannot agree.

Plaintiff responds that this discrepancy occurred only because opposing counsel asked Allen to work out exactly how much chromium had been used, thereby requiring him to review weighing tickets and perform some mathematical calculations while being deposed. This, according to plaintiff, provided Allen with inadequate time to perform the calculation. After Allen got back from the deposition, he performed the calculations and verified the 1,500 pound figure, then submitted his work as a correction to his deposition testimony.

Some courts, such as *Greenway*, have refused to allow a deponent to make material changes to his testimony. In general, however, courts allow witnesses to make such alterations. *See* 8A Charles A. Wright, Arthur R. Miller, & Richard L. Marcus, Federal Practice & Procedure § 2118, at 134 (1994). Rather than consign the deponent's initial response to the oblivion of the court reporter's computer, the proper course is to order that "the original answers must ... remain in the record." *Id.* at 135. That way, "[t]he witness who changes his or her testimony on a material matter between the giving of the deposition and appearance at the trial may be impeached by the former answers[.]" *Id.*

Accordingly, I will not order Allen's changes to his deposition testimony stricken as improperly making a material alteration. Nor will I strike them for untimeliness, in the absence of any prejudice to defendant. I will, however, direct that both sets of responses remain part of the record. In so ruling, I accord defendant the opportunity to use Allen's former answers as impeachment material at trial.

An appropriate order follows.

### ORDER

AND NOW, this 5th day of November 1998, upon consideration of defendant's motion for partial summary judgment dismissing plaintiff's indemnity claim, dkt. no. 26, and defendant's motion to strike changes to deposition testimony, dkt. no. 2, it is hereby ORDERED and DIRECTED that:

1. the aforesaid motions are DENIED;

2. both the original and amended versions of Allen's deposition are made part of the record, and may be used for impeachment as provided by the Federal Rules of Evidence;

3. the parties shall attend a pretrial conference on Friday, December 18, 1998, at 9:00 AM, U.S. District Courthouse, Room 936, 9th Floor, Pittsburgh, Pennsylvania.