125 F.3d 420
 AMERICAN NATIONAL BANK & TRUST COMPANY OF CHICAGO, not
individually, but as Trustee under Trust No.
107796-01,
Plaintiff-Counter-Defendant-
Appellee, Cross-Appellant,
v.
REGIONAL TRANSPORTATION AUTHORITY, a municipal corporation,
and Commuter Rail Board, its Rail Division,
Defendants-Counter-Plaintiffs,
Third/Party-Plaintiffs-
Appellants, Cross-Appellees,
and
NORTHEAST ILLINOIS REGIONAL COMMUTER RAILROAD CORPORATION,
Defendant-Counter-Plaintiff-Appellant, Cross-Appellee,
v.
W/H LIMITED PARTNERSHIP NO. 17, an Illinois limited
partnership, Walsh, Higgins & Company, an Illinois
corporation, and Congress Concourse Limited Partnership, an
Illinois limited partnership,
Third/Party-Defendants-Appellees, Cross-Appellants.
 Nos. 96-3610, 96-3611.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 28, 1997.
Decided Sept. 2, 1997.
Rehearing and Suggestion for Rehearing En Banc Denied Oct. 10, 1997.*
 
 Thomas A. Foran, Peter A. Silverman, Foran & Schultz, Kevin M. Forde, Mary Anne Mason, Kevin M. Forde, Ltd., Carl Gigante James R. Figliulo (argued), James J. Sipchen, Jr., Figliulo & Silverman, Chicago, IL, for plaintiff-appellee American National Bank and Trust Company of Chicago in No. 96-3610.
 Kevin M. Forde, Mary Anne Mason, Kevin M. Forde, Ltd., Carl Gigante, James R. Figliulo, James J. Sipchen, Jr., Figliulo & Silverman, Chicago, IL, for defendants-appellees W/H Limited Partnership No. 17, Walsh, Higgins & Company and Congress Concourse Limited Partnership in No. 96-3610.
 Thomas P. Sullivan, Barry Levenstam, Jenner & Block, Michael M. Conway (argued), Bruce Doughty, Hopkins & Sutter, Chicago, IL, for defendants-appellants Regional Transit Authority, Commuter Rail Board and Northeast Illinois Regional Commuter Railroad Corporation in No. 96-3610.
 Thomas A. Foran, Peter A. Silverman, Foran & Schultz, Carl Gigante, James R. Figliulo (argued), James J. Sipchen, Jr., Figliulo & Silverman, Chicago, IL, for American National Bank and Trust Company of Chicago in No. 96-3611.
 Carl Gigante, James R. Figliulo, James J. Sipchen, Jr., Figliulo & Silverman, for defendants-appellants W/H Limited Partnership No. 17, Walsh, Higgins & Company and Congress Concourse Limited Partnership in No. 96-3611.
 Michael M. Conway (argued), Bruce W. Doughty, Hopkins & Sutter, Chicago, IL, for Regional Transit Authority in No. 96-3611.
 Thomas P. Sullivan, Barry Levenstam, Jenner & Block, Michael M. Conway, Bruce W. Doughty, Hopkins & Sutter, for Commuter Rail Board and Northeast Illinois Regional Commuter Railroad Corporation in No. 96-3611.
 Before BAUER, COFFEY and RIPPLE, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 American National Bank and Trust of Chicago, as trustee of land trust number 107796-01, and for the beneficial owner of the land trust that owns the property involved in this case, filed a three-count complaint against the Regional Transit Authority and Metra (collectively, "RTA") relating to the RTA's renovation of the LaSalle Street Station in downtown Chicago. The RTA filed two compulsory counterclaims, alleging that the beneficial interest holder had breached its agreement with the RTA and had failed to pay other costs of delay that it caused the RTA. After a four-week trial, the jury returned a verdict for the plaintiffs on two counts and awarded a little over $24.5 million. The jury found for the RTA on one of American National's claims and on both counterclaims; on these latter claims, the jury awarded the RTA just over $782,000. The district court denied the parties' post-trial motions, and the parties appealed. We affirm the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 This case involves the operation of a commuter rail line running from Joliet, Illinois to Chicago. The RTA took over operation of the service from the Chicago & Rock Island Railroad Company ("Rock Island") after Rock Island filed for bankruptcy protection in 1975. The RTA acquired its rights to operate the commuter line from the trustee in Rock Island's bankruptcy proceeding. However, the background of the current dispute dates back to June 26, 1851. On that date, the Northern Indiana Railroad ("Northern Indiana") and the Rock Island entered into a contract to create a co-tenancy in a rail line from the south side of Chicago to downtown, including a depot at LaSalle Street. Under this contract, Northern Indiana agreed to construct and maintain a rail line that would connect Northern Indiana's line with the Rock Island line, which ran into the City. In return, Rock Island granted to Northern Indiana, their successors and assigns a "one-half, in common and undivided," interest in
 
 
 4
 the line of the said Chicago and Rock Island Railroad lying between the point of the junction of the road so to be built, from the Indiana State line, with said Chicago and Rock Island Railroad, and the terminus in the City of Chicago, and of the Depot in the City of Chicago, with the one undivided half of all the lands, rights of way and appurtenances, depot lands and privileges acquired or hereafter to be acquired for joint use.
 
 
 5
 R.169, Ex.1 at 2. Both parties also had an equal undivided interest in the rights and privileges "in surveying, locating and constructing the said road, its depot and appurtenances, and using, running or repairing the same." Id. Finally, the contract provided that the parties would divide the cost of repairs in proportion to each business on the jointly owned and operated section of the rail line. For many years, the Rock Island and Northern Indiana entered into numerous agreements confirming and supporting each party's right to continue railroad operation on the right of way and allocating the cost of maintaining the right of way for continued rail use. Northern Indiana's interest in the property was eventually acquired by the Penn Central Corporation.
 
 
 6
 In 1975 the Rock Island filed for bankruptcy, and a bankruptcy trustee, William M. Gibbons, was appointed. From 1975 to 1979, the trustee operated Rock Island's commuter line from Joliet to Chicago. In 1980 the RTA was authorized to operate the service and sought to acquire Rock Island's rights of way and equipment through the exercise of its power of eminent domain. After some negotiation between the RTA and the trustee, the RTA acquired the necessary rights to continue to operate the rail service for $35 million. The rights that it acquired are set forth in a November 12, 1982 Stipulation, a September 6, 1984 Supplement to the Stipulation and a September 6, 1984 Final Judgement Order (collectively, "1984 Judgment Order"). With respect to the property at issue in this appeal[1]--the North Parcel--the 1982 Stipulation provided that the RTA acquired[a] permanent relocatable easement interest for commuter railroad purposes in and to all of the rights, titles or interests of William M. Gibbons, Trustee ..., subject to:
 
 
 7
 (i) Existing easements, leases, licenses, ordinances and agreements, delineated in [various exhibits], and
 
 
 8
 (ii) All existing rights, titles or interests of the Penn Central Corporation, successors and assigns, and
 
 
 9
 ...
 
 
 10
 * * *
 
 
 11
 (iv) The rights of the Trustee under Paragraph 6A herein
 
 
 12
 ....
 
 
 13
 R.315, Ex.D at 5-6. Paragraph 6A of the Stipulation states:
 
 
 14
 [I]n the segments of real property between 17th Street and Congress Street, described in Exhibit A, that the Trustee shall have all sub-surface rights as aforesaid, as well as all air rights above a plane over the surface of the property at a height sufficient to accommodate the use of the property for commuter rail purposes.... In addition the Trustee shall have such rights in and to the surface (not irreconcilable with the RTA commuter service and facilities) as are necessary to use, develop and/or implement the air rights and subsurface rights for any lawful purposes.
 
 
 15
 Id. at 13.[2] The Supplement to the Stipulation provided that, incident to the RTA's permanent relocatable easement, the RTA had acquired the right of entry onto the trustee's retained rights for the maintenance and repair of its facilities. It was also understood, according to the Supplement, that safety concerns might require "changes or modifications to the presently existing structures, improvements, and any other facilities." R.315, Ex.E at 2. "Incident to the exercise of such right of entry, the RTA agrees that it will not unreasonably interfere with the retained rights of the Trustee...." Id. In addition, the RTA agreed to indemnify the trustee and his assigns from any claims, damages, losses or expenses arising from the RTA's exercise of this right.
 
 
 16
 In short, the RTA acquired from the trustee a permanent, relocatable easement and other rights to operate the commuter rail service. One such other right was the right of entry to maintain, repair or rebuild the facilities, including the LaSalle Street Station. In exercising this right of entry, however, the RTA could not interfere unreasonably with the rights retained by the trustee and had to indemnify the trustee for any damages arising from the RTA's repair or maintenance activities. The trustee, on the other hand, retained the rights to develop the air and sub-surface, including necessary incidental rights, as long as in developing these rights he did not unreasonably interfere with the RTA's exercise of its rights.
 
 
 17
 In June 1984, the bankruptcy trustee sold his retained rights in the property to the Chicago Pacific Corporation ("CPC"). CPC negotiated with the RTA to try to develop a plan by which the LaSalle Street Station (by this time in great need of repair and renovation) could be renovated and by which the CPC could develop its air rights. However, no agreement between these parties was reached, and subsequently the CPC merged with the Maytag Corporation. By 1989 the RTA had failed to reach an agreement with Maytag as to how the two could develop the property, and the RTA decided to proceed with its construction plans. It awarded a contract to Kiewit Western Company ("Kiewit") to rebuild the LaSalle Street Station. Also in 1989, Maytag sold its interest in the property to American National Bank & Trust, as trustee. The beneficial interest holder of this land trust was a real estate group, VMS. W/H Limited Partnership No. 17 ("WH") acquired VMS' rights and is the current beneficial owner of the land trust.[3] Soon after the RTA began working on renovating the station, WH asked the RTA to cease its construction operations until the two could coordinate their plans--the RTA's renovation of the LaSalle Street Station and WH's proposal to develop its air rights. WH believed that the RTA was required to cease its operations until the two sides could coordinate their plans; the RTA disagreed. After negotiation, the two parties reached a compromise on March 20, 1990: The parties entered into a Lump Sum Agreement, under which the RTA agreed to cease construction until July 13, 1990; WH agreed to provide notice to the RTA of WH's commitment to proceed with a coordinated infrastructure or to pay up to $500,000 and allow operations to resume again on July 14. WH also agreed to reimburse the RTA for its contractors' delay costs.
 
 
 18
 During the hiatus, the parties tried to reach agreement on a coordinated infrastructure plan, one which would support the LaSalle Street Station without inhibiting the RTA's ability to run the commuter rail service and which would also support an elevated platform or raft on which WH could construct high-rise buildings. Essentially, WH would, in coordination with the RTA, build stilts to support an elevated platform that would sit above the train station. It was necessary that the parties coordinate their infrastructure designs and construction so that the same caissons, foundational supports, would support both the LaSalle Street Station and WH's contemplated platform. The coordination was necessary because, if WH did not build its caissons at the same time and in the same location as the RTA, it would have been nearly impossible for WH to build its caissons at all without having to interrupt train service significantly and possibly to tear down some of the structures that the RTA already would have built. The costs to WH would be very significant. Under the proposed plan, WH's platform would be well supported and sturdy enough that another developer would be able to construct a high-rise building on the raft.
 
 
 19
 The two sides held numerous technical and nontechnical meetings. Many hours were spent revising and re-revising construction plans. As the end of the construction hiatus approached, however, there were still a number of issues that had not been resolved: Some of the engineering problems had not been finally solved; the parties disagreed as to how much of a construction bond WH should post; and the parties were at loggerheads over whether WH would retain the RTA's protest rights against the RTA's contractors relating to the amount of the contractor's delay costs WH had agreed to pay.
 
 
 20
 Several days before the July 13 deadline, Kiewit presented the RTA with a $1.2 million bill for costs associated with the several-month delay. The RTA asked WH to pay this amount, but WH thought that the amount was too high. The RTA went back to its contractor, and the bill was reduced to $692,000. WH still refused to pay. On July 13, the deadline to which the parties had agreed, WH sent a letter to the RTA stating that WH was reviewing the RTA's final position on some of the unresolved issues, which WH had only recently received. Therefore, according to the letter, WH was not prepared to provide the RTA a definite answer on whether WH would proceed with development of its air rights.[4] The letter concluded by suggesting that the principals should meet to resolve and finalize any outstanding issues. Because WH had failed to provide notice that it would proceed by July 13, the RTA recommenced construction on July 14. The renovation of the LaSalle Street Station was completed in 1992. In this suit, WH maintained that the RTA's unilateral construction of the station made it impossible for it to develop its air rights over the station.
 
 B. District Court Proceedings
 
 21
 American National Bank and Trust, as trustee of trust number 107796-01 (beneficial interest holder, WH), filed suit in federal district court on June 2, 1993. WH's basic contention was that, by recommencing construction, the RTA has prevented WH from exercising its development rights, thus making such rights virtually worthless. Because the RTA did not coordinate with WH to construct caissons suitable to support both the station and the raft, WH cannot build any caissons at all. Specifically, the three-count complaint alleged that, by recommencing construction on July 14, 1990, the RTA (1) breached the 1984 Judgment Order, (2) was obligated to indemnify WH for any costs--i.e., the lost economic value of WH's rights--associated with the RTA's renovation of the LaSalle Street Station, and (3) trespassed on WH's rights (those that had been retained by the bankruptcy trustee and that were subsequently acquired by WH). In response, the RTA filed two counterclaims: (1) that WH had breached the Lump Sum Agreement and therefore owed the RTA $500,000 and (2) that WH had failed to reimburse the RTA, as WH had agreed to do, for delay costs incurred. In addition to filing this suit, WH (as the successor to Northern Indiana) filed another suit in state court for inverse condemnation and trespass. That case involved the South Parcel. There WH alleged that the RTA's construction invaded its rights as successor to the co-tenancy of Northern Indiana, which WH had acquired from the Penn Central Corporation. On appeal, the Illinois Appellate Court held in favor of the RTA based on the 1851 contractual rights the RTA had acquired from Rock Island.
 
 
 22
 In the present case, the district court conducted a four-week trial to resolve these complicated issues. At trial the parties presented a plethora of witnesses to support each side's position: the RTA's witnesses testifying that, in building the station, the RTA was well within its rights and did not unreasonably interfere with WH's air rights; WH's witnesses testifying to its commitment to make the coordinated construction a reality, notwithstanding the many hurdles that the RTA placed in its path. There were also a number of witnesses who testified as to the alleged damages that WH sustained.
 
 
 23
 The jury returned a verdict in favor of American National (WH) on its first two claims; the jury found that the RTA had breached the 1984 Judgment Order and had breached its duty to indemnify WH for economic losses associated with the RTA's exercise of its right of entry to repair the station. The jury awarded American National $24,544,830. The jury found for the RTA on the remaining claim (trespass) and on the RTA's two counterclaims, breach of the Lump Sum Agreement and failure to pay the RTA's delay costs, as agreed. The jury awarded the RTA $782,035 on the counterclaims.
 
 
 24
 Both parties filed post-trial motions, which the district court denied. The district court found that the jury's verdicts were supported by the evidence. The court rejected the RTA's argument that the verdicts were inconsistent, reasoning that it was possible for WH to perform substantially its obligations with respect to the rights it acquired from the Rock Island bankruptcy trustee and not meet the separate obligations imposed by the Lump Sum Agreement. On the flip side, according to the court, it was not logically inconsistent for a jury to determine that, by unreasonably interfering with WH's rights during the renovation of the station, the RTA breached its duties to WH under the 1984 Judgment Order, but was still owed $500,000 for WH's breach of the separate duty imposed by the Lump Sum Agreement. The district court also denied the RTA's request to amend its answer, after trial, to raise the issue of collateral estoppel. After "weighing all the circumstances and factors," the court concluded that the proper exercise of its discretion leads to a denial of the RTA's motion. See R.387. The court reasoned that the potential issue of collateral estoppel had not been raised either explicitly or implicitly earlier and that it was too late to do so in the post-trial motions.
 
 II
 DISCUSSION
 A. Collateral Estoppel
 
 25
 The RTA submits that the Illinois Appellate Court decision in American Nat'l Bank & Trust Co. v. Regional Transit Authority, No. 1-94-0882 (Ill.App.Ct. March 29, 1996), collaterally estops WH, as a matter of law, from recovering on its claim that the RTA unreasonably interfered with WH's rights. Therefore, the RTA suggests, we should vacate the jury's verdicts that were unfavorable to the RTA. The Illinois Appellate Court found that, in granting an easement to the RTA, the bankruptcy trustee conveyed the Rock Island's preexisting rights to operate and repair the railroad. The trustee could not and did not create new rights in the property, said the court, without the consent of Penn Central, Northern Indiana's successor. The trustee could sell to the RTA, continued the Illinois court, only his existing rights in the property. "By exercising the Trustee's rights in operating a commuter railroad, the RTA merely stepped into Rock Island's shoes and did not impact [its co-tenant's] rights any more than if Rock Island had continued operating the railroad." Id., slip op. at 6.
 
 
 26
 The district court here did not address the merits of the RTA's contention; rather, the court denied the RTA's motion to amend its answer to raise collateral estoppel as an affirmative defense. The court reasoned that raising the issue, as the RTA had, after the trial was completed, despite the RTA counsel's certain awareness of the possible collateral estoppel defense, was not warranted. The court determined that to allow the amendment would cause WH significant prejudice and that "there was ample basis and opportunity to raise collateral estoppel as an affirmative defense earlier." R.387.
 
 
 27
 We review the district court's denial of the RTA's motion to amend its answer for an abuse of discretion. See Illinois Conf. of Teamsters & Employers Welfare Fund v. Steve Gilbert Trucking, 71 F.3d 1361, 1368 (7th Cir.1995) (also stating that "the presumption that leave to amend shall be freely given ... disappears after the entry of judgment"); Nagy v. Riblet Prods. Corp., 79 F.3d 572, 575 (7th Cir.1996) ("By the time the trial begins, pleadings have faded into history. The document controlling the course of trial is the pretrial order.... District court judges may amend the pretrial order to prevent injustice, but appellate review of decisions either way is deferential."); see also Joseph Mfg. Co. v. Olympic Fire Corp., 986 F.2d 416, 418-19 (10th Cir.1993) (noting that party could have identified inchoate legal defense in pretrial order because party knew of existing state action and its potential effect on federal litigation). The RTA was aware of the state court litigation and the theories it was presenting there, but did not list collateral estoppel as an issue in the pretrial order. Before the final pretrial order was issued in this case, the RTA was pressing the claim that it now seeks to use to collaterally estop WH's claims in this litigation before the Appellate Court of Illinois. Instead of raising this inchoate affirmative defense in the federal litigation, the RTA successfully moved in a motion in limine to have any reference to the parallel state litigation excluded. The RTA at that time argued that the issues involved in these two cases were completely different from one another. R.276. Under these circumstances, we do not believe that the district court abused its discretion. Cf. Gorlikowski v. Tolbert, 52 F.3d 1439, 1443-44 (7th Cir.1995) ("Because the parties rely on the pretrial conference to inform them precisely what is in controversy, the pretrial order is treated as superseding the pleadings and establishes the issues to be considered at trial.") (internal quotation and citation omitted); Nagy, 79 F.3d at 575 (noting that, with respect to pretrial orders, court has "enforced a stringent rule of forfeiture").
 
 
 28
 However, even were we to reach the merits of the RTA's collateral estoppel claim, we would reject it. In determining the validity of a collateral estoppel claim, we must give state "judicial proceedings" the "same full faith and credit ... as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738; see E.B. Harper & Co. v. Nortek, Inc., 104 F.3d 913, 921 (7th Cir.1997). Thus, Illinois' law of collateral estoppel applies. Under Illinois law, "[c]ollateral estoppel means that when an issue of ultimate fact has been previously determined by a valid and final judgment, that issue cannot be relitigated between the same parties." In re T.G., 285 Ill.App.3d 838, 221 Ill.Dec. 126, 133, 674 N.E.2d 919, 926 (1996). "In order for a previous judgment to be conclusive, it must appear clearly and certainly that the identical and precise issue was decided in the previous action." Hexacomb Corp. v. Corrugated Sys., Inc., 287 Ill.App.3d 623, 222 Ill.Dec. 893, 899, 678 N.E.2d 765, 771 (1997) (emphasis added); accord Kessinger v. Grefco, Inc., 173 Ill.2d 447, 220 Ill.Dec. 137, 143, 672 N.E.2d 1149, 1155 (1996). The party asserting collateral estoppel bears a heavy burden of proof. Hexacomb, 222 Ill.Dec. at 899, 678 N.E.2d at 771. The RTA would have to demonstrate:
 
 
 29
 (1) the issue presented in the current action is identical to one decided in prior adjudication; (2) there was a final judgment on the merits in the prior adjudication; and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication.
 
 
 30
 Chidichimo v. University of Chicago Press, 289 Ill.App.3d 6, 224 Ill.Dec. 125, 128, 681 N.E.2d 107, 110 (1997).
 
 
 31
 With these principles in mind, we turn to the RTA's contentions. There is no dispute here that the second and third threshold requirements for collateral estoppel are met. The RTA has a final judgment on the merits from an Illinois court, and WH was a party to that litigation. However, the RTA cannot prevail with respect to the first prong: the identity of issues. The Illinois Appellate litigation involved the rights that the RTA had acquired from the Rock Island trustee with respect to the rights that WH had received as the successor to Northern Indiana, Rock Island's co-tenant. The Appellate Court of Illinois found that, as between the successor to Rock Island and the successor to Northern Indiana, Rock Island's successor stood in the same position as Rock Island; the Rock Island trustee could not create new rights vis-a-vis Northern Indiana's successor without the consent of that successor. According to the court, the Rock Island trustee could sell only the rights that he owned.
 
 
 32
 The litigation before us, however, involves different issues. The present litigation concerns the rights of the RTA acquired from the Rock Island trustee with respect to WH's rights also acquired from the Rock Island trustee. The trustee subdivided the rights that Rock Island possessed and vested some of those in the RTA and others in WH; however, he did not create any new rights that might infringe on Rock Island's co-tenant's rights. The rights that the trustee conveyed to each, the RTA and WH, were subject to the rights conveyed to the other party as set out in the 1984 Judgment Order. Under the 1984 Judgment Order, the RTA and WH (both successors to Rock Island's rights) each had the duty not to interfere unreasonably with the other's rights. WH and the RTA, as successors to Rock Island, were each given only a portion of Rock Island's rights and were constrained by the 1984 Judgment Order in the exercise of those rights; WH as the successor to Northern Indiana's rights was not so constrained because WH, in this capacity, was not subject to the 1984 Judgment Order. So, with respect to WH, Northern Indiana's successor, the RTA stepped into the shoes of Rock Island. But with respect to WH, the co-successor of Rock Island, the RTA stepped into the shoes of Rock Island only to the extent that the 1984 Judgment Order allows. When exercising its rights acquired from the trustee with respect not to its co-tenant but to the other successor of Rock Island, the RTA is subject to the terms of the 1984 Judgment Order. In short, the RTA owed WH, as co-successor to Rock Island, the special contractual duty not unreasonably to interfere with WH's rights. Because of this significant difference in the manner in which WH acquired its rights, as successor to Northern Indiana and as co-successor of Rock Island, the issues at contest in the state litigation are not the "identical and precise issue[s]" that are pending before us. Therefore, we cannot accept the RTA's collateral estoppel claim.[5]
 
 B. Consistency of the Jury Verdicts
 
 33
 The RTA claims that the jury's verdicts are internally inconsistent. The RTA contends that: (1) The verdict in favor of the RTA on counterclaim II-involving the Lump Sum Agreement under which WH agreed to pay the RTA $500,000 if WH did not provide notice that it would proceed with the project by July 13, 1990--could not be reconciled with the jury verdicts on WH's counts I and II, both involving the breach of the 1984 Judgment Order; and (2) the verdict in favor of the RTA on WH's trespass claim is inconsistent with the jury's verdict in favor of WH on WH's counts I and II. The district court found that the verdicts were reconcilable and denied the RTA's post-trial motion for judgment as a matter of law or a new trial.
 
 
 34
 Before addressing each of these two contentions individually, we set forth the heavy burden that the RTA must meet to succeed in its argument. Our review of a district court's denial of a post-trial motion for a new trial is deferential. Mercado v. Ahmed, 974 F.2d 863, 866 (7th Cir.1992). We will reverse the district court's decision to deny such a post-trial motion only upon a showing that the district court abused its discretion. U.S.E.E.O.C. v. Century Broadcasting Corp., 957 F.2d 1446, 1460 (7th Cir.1992). Under the abuse of discretion standard, "we shall not second-guess the decision of a trial judge that is in conformity with established legal principles and, in terms of its application of those principles to the facts of the case, is within the range of options from which one would expect a reasonable trial judge to select." United States v. Hamilton, 19 F.3d 350, 354 n. 3 (7th Cir.), cert. denied, 513 U.S. 986, 115 S.Ct. 480, 130 L.Ed.2d 394 (1994); Soler v. Waite, 989 F.2d 251, 253 (7th Cir.1993) (internal quotation and citation omitted). "When faced with apparently inconsistent verdicts, we are required to reconcile them, if possible, rather than overturn them." Century Broadcasting Corp., 957 F.2d at 1460.
 
 
 35
 Our review of a post-trial motion for judgment as a matter of law, on the other hand, is de novo, but we view the evidence in the light most favorable to the non-moving party, WH. See Mangren Research & Dev. Corp. v. National Chem. Co., 87 F.3d 937, 941 (7th Cir.1996). In applying this standard, we evaluate whether any reasonable jury could have reached the conclusion that it did. If we answer this question in the affirmative, then we will not overturn the district court's decision not to grant judgment as a matter of law. Id.
 
 1.
 
 36
 The RTA does not believe that the jury's verdict in the RTA's favor on counterclaim count II can rationally coexist with the jury's verdict on WH's counts I and II. The RTA urges that complying with the Lump Sum Agreement fulfilled its obligations under the 1984 Judgment Order. The district court disagreed and harmonized the verdicts as follows:
 
 
 37
 Counterclaim Count II dealt with the Lump Sum Agreement under which W-H was to proceed by July 13, 1990 or pay Metra $500,000. W-H neither proceeded by July 13, 1990 nor paid the $500,000 and the jury so found. This Lump Sum Agreement was separate and made after the making of the [1984 Judgment Order] which RTA/Metra breached and thereby damaged W-H as the jury found in returning its verdict for W-H on its claims Counts I and II. Counts I and II of W-H's claims dealt with whether W-H substantially performed and whether Metra breached its obligations under the [1984 Judgment Order]. W-H did substantially perform its obligations under the [1984 Judgment Order] but did not comply with the separate Lump Sum Agreement's July 13, 1990 deadline. This obligated W-H to pay Metra $500,000. Metra, likewise, breached the [1984 Judgment Order] by not reasonably cooperating and coordinating but was owed the $500,000 W-H agreed to pay under the separate contract.... In essence, W-H's not proceeding by July 13, 1990 triggered W-H's obligation to pay the $500,000 under the Lump Sum Agreement but was not a failure to substantially perform under the [1984 Judgment Order] and RTA/ Metra's right to obtain that $500,000 was separate from RTA/Metra's breach....
 
 
 38
 R.391. We do not believe that the district court's reconciliation of these verdicts is unreasonable. The 1984 Judgment Order imposed a broader array of obligations and duties on the parties than did the Lump Sum Agreement. A reasonable jury could have concluded that the RTA fulfilled its obligation not to continue to build during the hiatus and still breached its further duties not to interfere unreasonably with WH's retained rights during or after the hiatus. We therefore hold that the district court did not abuse its discretion by denying the RTA's motion for a new trial and that the RTA was not entitled to judgment as a matter of law based on the alleged inconsistencies of these verdicts.
 
 2.
 
 39
 The RTA also asserts that the jury's verdicts on WH's counts I and II are inconsistent with the jury's verdict on count III, the trespass claim. The RTA reasons that, because it did not trespass on WH's rights (count III), it could not have interfered unreasonably with WH's rights (counts I and II). The RTA has understated the scope of its duties under the 1984 Judgment Order. The court instructed the jury that, to find for WH on the trespass claim, WH had to show that the RTA had exceeded "its easement rights for any unauthorized purpose, either in the manner or to the extent of its use of the easement, and [went] on the premises of the landowner beyond the easement without express or implied permission or invitation...." Tr. at 3853.
 
 
 40
 First, the verdict on count II, the indemnity provision claim, is not inconsistent with the trespass claim. In the Supplement to the Stipulation, the RTA agreed to indemnify the trustee (or his successors) from any claims, damages, losses or expenses arising from the exercise of its right of entry for the maintenance and repair of the railroad facilities. We think it quite reasonable for a jury to conclude that, although the RTA was within its own rights to enter onto WH's retained rights because of the RTA's right of entry (thus not committing a trespass), the RTA still was obligated under the 1984 Judgment Order to indemnify WH (therefore a jury verdict in favor of WH on count II). Second, we similarly do not find that the verdict on count I conflicts with the verdict on count III. The jury was instructed that, to find for WH on the trespass claim, WH had to show that the RTA had exceeded "its easement rights for any unauthorized purpose." Tr. at 3853 (emphasis added). A jury reasonably could have believed that the RTA had not unreasonably interfered with WH's rights for an unauthorized purpose, but that it had interfered with WH's rights unreasonably with respect to the trespass offense. WH also had the burden of demonstrating that the RTA had gone "on the premises of the landowner beyond the easement." Tr. at 3853. A jury could have concluded, quite reasonably we think, that the RTA had not gone onto the premises of WH and still unreasonably interfered with WH in its dealings with WH. Because we reasonably can reconcile these verdicts, we cannot hold that the district court chose an option from which one would not expect a reasonable trial court to select when it denied the RTA's motion for a new trial. We also agree with the district court that the RTA was not entitled to judgment as a matter of law based on the inconsistency of the verdicts rendered by the jury.
 
 C. Other Rulings
 
 41
 The RTA also makes several other arguments concerning mistakes that the district court allegedly made which, in its view, affected the outcome of the case. First, the RTA submits that the court should have granted the RTA's motion for judgment as a matter of law on count II, the indemnification clause claim, because the clause was intended to cover only third-party claims, not injuries that the RTA caused WH in exercising the RTA's right of entry. We review a denial of a motion for judgment as a matter of law de novo, but in doing so we view the evidence in the light most favorable to WH. See Mangren Research & Dev. Corp. v. National Chem. Co., 87 F.3d 937, 941 (7th Cir.1996). We apply the federal standard and ask ourselves whether any reasonable jury could have reached the conclusion that it did. If we answer this question in the affirmative, then the district court's denial must stand. Id.
 
 
 42
 The indemnification clause is quite broad. The Stipulation provides that the RTA "will forever defend, indemnify, and hold Trustee harmless from any claims, damages, losses or expenses arising from the exercise" of the RTA's right of entry to repair and maintain the railroad facilities. R.315, Ex.E at 2. The district court determined that the clause was ambiguous with respect to whether the RTA had agreed to indemnify WH for all claims and damages arising from the RTA's exercise of its right of entry or for only those claims involving third parties. Consequently, the court allowed the RTA to provide extrinsic evidence of the meaning of the clause[6] and allowed the jury to determine the scope of the RTA's promise.
 
 
 43
 Neal, who had represented the RTA in its negotiations with the Rock Island trustee, testified on direct examination that he understood the clause to mean that the RTA would indemnify the trustee only for third-party claims. He stated that the clause was inserted to alleviate the trustee's concern that an individual who got hurt because of the RTA's construction would sue the trustee (or his successor). In such an instance, or if the RTA's maintenance (or lack thereof) caused property damage to a third party, then the trustee would be held harmless. On cross-examination, however, Neal testified that he had never actually discussed with the trustee's counsel whether the clause covered exclusively third-party claims.[7] The language and breadth of the clause, coupled with the rather inconclusive testimony of Neal, permit a reasonable jury to conclude that the RTA's promise was not as narrow as the RTA argues. The language of key phrases in the clause--"forever defend, indemnify, and hold ... harmless"; "any claim, damages, losses or expenses"; and "arising from," R.315, Ex.E at 2 (emphasis added)--is susceptible to different interpretations, including the one given it by the jury on the basis of the evidence before it. Because the jury's conclusion on this point is reasonable, the district court correctly denied the RTA's motion for judgment as a matter of law on this basis.
 
 
 44
 Second, the RTA contends that several of the district court's jury instructions were erroneous. The RTA believes that the jury was misinformed as to the relationship between Metra and the RTA.[8] The RTA argues that it had divested itself of all interests in the property at issue here by assigning its interests to Metra. The RTA also suggests that the district court erroneously stated WH's responsibility with respect to proving that WH and its predecessors-in-interest had substantially performed their obligations under the contract.
 
 
 45
 We note at the outset that, in evaluating whether the district court's instructions to the jury were correct statements of the law and were supported by the evidence, we review the instructions in their entirety; in doing so, we consider "whether the jury was misled in any way and whether it had understanding of the issues." United States v. Perez, 43 F.3d 1131, 1137 (7th Cir.1994) (internal quotation and citation omitted). We review the district court's actions for an abuse of discretion. United States v. Neville, 82 F.3d 750, 759 (7th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 249, 136 L.Ed.2d 177 (1996). We have reviewed the jury instructions carefully, and we are unpersuaded by the RTA's submissions. The court instructed the jury that Metra and the RTA were separate municipal corporations with the right to sue and be sued. The court also informed the jury that Metra "is the governmental operating division of the RTA that is responsible for providing public transportation by rail" in Cook County. Tr. at 3835. No one disputes that this is an accurate statement of the RTA's and Metra's relationship.
 
 
 46
 However, the RTA believes that the court went astray when it instructed: "[A]ny actions taken by METRA relating to the 500 South LaSalle Street property from December 31, 1984 through the present are binding on the RTA." Tr. at 3835. The record contains sufficient evidence to support the district court's giving this instruction. A portion of the RTA's answer to the complaint was read into evidence. In their answer, the RTA and Metra responded to WH's allegation that the RTA and Metra intentionally entered upon WH's property and constructed permanent new structures and improvements. Their response was read into the record, without objection from either the RTA or Metra, before the jury:
 
 
 47
 [It is] admitted that beginning in late 1989 and continuing through late 1990 RTA and METRA intentionally entered upon portions of the north property and the south property to repair and renovate the LaSalle Street Station ... and constructed permanent new structures and improvements within the RTA's and METRA's permanent relocatable easement....
 
 
 48
 Tr. at 3551. In addition, the Supplement defines the RTA to include the Northeast Illinois Regional Commuter Railroad Corporation, Metra. We believe that the district court acted well within its discretion in giving the instruction that it did to the jury, as it was supported by evidence in the record and was not confusing to the jury.
 
 
 49
 Similarly, the RTA urges that the district court misinstructed the jury with respect to WH's burden of proof on the issue of the substantial performance of WH and its predecessors. The trial court instructed the jury:
 
 
 50
 On Count 1 of the complaint of [WH] you must decide the following issues, and there are three such issues. The first issue:
 
 
 51
 1. Whether [WH] substantially performed the obligations they undertook as the landowners under the contract.
 
 
 52
 [WH] claims that it substantially performed its obligations under the contract. The RTA and METRA claim the landowners, which include [WH], failed to substantially perform their obligation under the contract....
 
 
 53
 ....
 
 
 54
 [WH] has the burden under Count 1 of its complaint of proving each of the following propositions:
 
 
 55
 1. That [WH] substantially performed the obligations they undertook as the landowners under the contract....
 
 
 56
 Tr. at 3841-43. We disagree that these instructions inappropriately shifted the burden of proof to the RTA. The instructions clearly place that burden on WH. These instructions allowed the parties to present to the jury their respective arguments on whether WH and its predecessors had substantially performed the contract. The district court did not abuse its discretion in giving these instructions.
 
 D. WH's Damages
 
 57
 The parties devoted a significant amount of time during the trial in presenting testimony and evidence relating to the damages that WH sustained. The district court allowed two partners in WH, John Higgins and Jack Crocker, to testify about the value of the North Parcel.[9] Crocker testified that the value of the North Parcel would be between $450 and $550 per square foot, once the raft was built. Higgins testified that, once the raft was complete, the land would market for between $500 and $550 per square foot and that some nearby properties were commanding as much as $1,500 a square foot.
 
 
 58
 During Higgins' testimony, under vigorous cross-examination, the RTA's counsel pursued a line of questioning with Higgins to arrive at an estimate of the value of the property by eliciting the overall cost to construct the raft. Higgins testified that the cost to WH to acquire its 50% interest in the property, on a per-square-foot basis, was $97.60. Higgins also testified on cross-examination that the costs of completing the raft, on a per-square-foot basis, were as follows: $22.97 in interest on the portion of the loan attributable to the North Parcel over a 28-month period (the estimated time to complete the raft), $48.14 for real-estate taxes and other "soft costs" such as engineering and consultants' fees, and $118.30 in actual construction costs. Adding these numbers together at the RTA's counsel's direction, Higgins testified that the cost of constructing the raft would come out to $287.01 per square foot of raft.
 
 
 59
 On re-direct, Higgins arrived at WH's damages using a different method. At his own counsel's direction, Higgins multiplied the size of the raft, 72,694 square feet, by his estimate of the raft's value, $500 per square foot. This calculation yields a product of $36,347,000. From this number, Higgins' counsel had him subtract many of the same costs, although not on the per-square-foot basis that the RTA's counsel had discussed: $8,600,000 to build the raft, $3,500,000 in real estate taxes and soft costs, and roughly $1,500,000 in interest. In addition, WH's counsel had Higgins subtract the cost to WH to acquire the remaining 50% interest from Harris Bank[10] ($6,500,000) and additional soft costs ($1,000,000). Higgins testified that the value of the land developed, assuming a value of $500 per square foot and a raft of 72,694 square feet, less the cost to develop the land was $18,737,625. In arriving at this figure, Higgins did not deduct the cost to WH to acquire its present interest in the property, but testified as to why deducting that cost was inappropriate.[11] In closing argument, WH argued to the jury that this latter method was the appropriate one and asked the jury to return a verdict for WH in the amount of $18,737,625.
 
 
 60
 The RTA also presented its own expert witness to testify as to the property's value. Michael Kelly, a real estate appraiser, testified that he examined the sales of a number of other sites that he considered similar, in terms of location and size, to the subject property.[12] He testified that there were significant factors in reaching a conclusion on the appraised value of the property. In terms of location, he testified that, all else being equal, the farther north in the central Loop a parcel is, the more valuable the property. In terms of size, Kelly testified that, all other variables being equal, the greater the size of the developable property, the lower the value of the property on a per-square-foot basis. Considering the comparable sales, Kelly concluded that the average value of the 270,000 square foot parcel of land (North and South Parcels combined) was $50 per square foot. He stated however that, if just the North Parcel of land were considered, the value would be greater than $50 per square foot because that parcel is the northern-most portion of the entire property. Kelly did not testify as to what his appraisal for that portion was. He also testified that, in his opinion, it was appropriate to include the entire North Parcel (95,156 square foot parcel) in determining the lost value of the property.[13] This figure included the portion owned by the City of Chicago over which WH had an easement. On re-direct, the RTA did not question Kelly on whether, if one were to accept WH's estimates of the value of the completed raft, the easement, on a square foot basis, would be worth the same amount as the rest of the North Parcel, $500-$550, or a significantly lesser amount. In closing, the RTA's counsel relied on his expert's testimony and asserted that evidence showed that the value of the land with the raft was $50 per square foot which, if true, would mean that the costs of building the raft would be greater than the value of the property. In making this calculation, the RTA's counsel appears to have assumed the appropriate square footage was 72,694 square feet, the North Parcel excluding the City of Chicago's interest.
 
 
 61
 The jury returned a verdict in favor of WH for $24,544,830, thus appearing to reject both counsels' valuation of the property. Instead, the jury reached its own conclusion.[14] It could have reached the verdict it did through a multistep process. First, it could have credited the testimony of Higgins and Crocker that the value of the raft would have been within the range of $450 and $550 per square foot and could have found that $550 per square foot was the appropriate value of the raft. It then could have accepted the testimony elicited from Higgins on cross-examination that the cost of developing the raft would have amounted to $287 per square foot. Next, the jury, relying on the testimony of the RTA's expert Kelly, could have concluded that the appropriate size of the parcel for valuation purposes was 95,156 square feet. Using such a formula, the jury could have concluded that WH's damages were as much as $25,026,028.[15] "Of course, we do not know for sure whether the jury actually made such calculations, but a jury has wide discretion in determining damages, so long as it has a reasonable basis." Dresser Indus., Inc. v. Gradall Co., 965 F.2d 1442, 1447 (7th Cir.1992). We turn now to whether this jury acted within the boundaries of its "wide discretion."
 
 
 62
 The RTA argues that the jury's award warrants a new trial or remittitur. We, like the district court, certainly have the authority to grant a new trial or a remittitur if the circumstances so warrant. Bucher v. Krause, 200 F.2d 576, 588 (7th Cir.1952), cert. denied, 345 U.S. 997, 73 S.Ct. 1141, 97 L.Ed. 1404 (1953); see 28 U.S.C. § 2106 ("The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order ... as may be just under the circumstances."). In order for the circumstances to so warrant, however, a jury award must be " 'monstrously excessive, born of passion and prejudice, or not rationally connected to the evidence.' " Dresser Indus., Inc., 965 F.2d at 1446 (quoting Pincus v. Pabst Brewing Co., 893 F.2d 1544, 1554 (7th Cir.1990)); accord Miksis v. Howard, 106 F.3d 754, 764 (7th Cir.1997). "Because damage calculations are essentially an exercise in factfinding, our review of the jury's damage award is deferential." Dresser Indus., Inc., 965 F.2d at 1446. In instances such as the present one, in which the district court has already denied a party's motion for remittitur or a new trial, we review that decision for an abuse of discretion. Gasperini v. Center for Humanities, Inc., 518 U.S. 415, ----, 116 S.Ct. 2211, 2224, 135 L.Ed.2d 659 (1996); Miksis, 106 F.3d at 764.
 
 
 63
 We begin by noting that there is nothing to suggest, and no party argues, that these jurors acted out of a passion or prejudice. We therefore need consider only whether the award was monstrously excessive or not rationally connected to the evidence. The RTA assigns several errors to the jury that, in its view, necessitate a new trial on damages or a remittitur. First, says the RTA, the jury's apparent inclusion of WH's easement over the City of Chicago's interest in the North Parcel was not supported by the evidence. According to the RTA, by including in its damage calculation property that WH did not own, the jury awarded damages that were not rationally supported by the evidence.
 
 
 64
 We do not agree. The jury heard evidence from the RTA's own expert witness that WH's easement interest was properly includable in the damage calculation. As previously noted, in testifying about whether one of his comparable sites was superior or inferior to the subject property with respect to size, Kelly based the comparison on a square footage that included the easement's area. More significantly, he testified directly that, in performing his market value analysis, he intentionally included the square footage of the easement parcel because it could be used to create "bonus values" and would allow its owner a higher density for the purpose of zoning. The RTA elicited no evidence to the contrary. Although the easement added some value to the adjacent interest, one might be skeptical that it added a value identical to the value of WH's adjacent interest. Kelly's testimony on this point, however, was unrebutted. Given our deferential standard of review, we cannot say that the district court abused its discretion in finding that a jury could have concluded that, in determining the extent of WH's damages, it was appropriate to include the area of WH's easement in the manner that the RTA's expert suggested: that the easement interest had the same value as WH's fee simple interest in the North Parcel.
 
 
 65
 The RTA also argues that WH's award should be remitted because the method the jury used in arriving at its award was erroneous under Illinois law.[16] The RTA submits that the evidence that WH submitted was not of the lost fair market value of the land, but was lost profits to WH, a measure of damages usually considered speculative under Illinois law. See Stuart Park Assocs. v. Ameritech Pension Trust, 51 F.3d 1319, 1328 (7th Cir.1995) (noting that, under Illinois law, a new business generally has no right to lost profits). The parcel was valued by taking the estimated value of the land with WH's planned improvements and deducting the cost of the improvements. The RTA contends that this method is erroneous as a manner of appraising the land because the jury did not discount the land's alleged value at its highest and best use (as a raft) by the probability that the actual construction would occur, accounting for such things as the contingency that the City of Chicago would rezone the parcel and that WH would have been able to secure the appropriate financing.[17]
 
 
 66
 We first note that the method of calculating damages of which the RTA complains is precisely the same method by which its own expert witness calculated damages. It is not simply an estimate of "lost profits." Rather, it is a consideration of the highest and best use of the property, a calculation that necessarily requires consideration of the potential future uses of the property. Additionally, the RTA argued neither to the jury nor to the court in its post-trial motion that the damages should be reduced to account for these contingencies. Nor did the RTA suggest any figure for such a discount rate.
 
 
 67
 With respect to the merits of the RTA's position-that the value of the parcel at its highest and best use should be discounted for the various contingencies that the land would be put to such a use--, the evidence presented to the jury on this score was quite scant. Specifically, on the subject of the likelihood that the City of Chicago would rezone the parcel so that a high-rise could be built on the completed raft, the RTA's own expert appraiser, Kelly, testified that the value of the land should not be reduced to account for its current zoning. During cross-examination, WH's counsel asked Kelly:
 
 
 68
 Q: And with respect to the zoning issue, did you conclude that that [the property's zoning] would have any limitation on the ability to develop a high rise facility at that site?
 
 
 69
 A: No. The property is actually zoned for what we call an FAR of 12, and the practice in downtown Chicago has been that as developers go in these planned unit developments, they've normally been able to achieve a higher FAR than that, so we have not made any negative adjustment for the existing zoning.
 
 
 70
 Q: Because you assumed, based on your experience, that if they were to proceed with a high rise development that they could obtain a planned unit development from the City that would have permitted that kind of a development?
 
 
 71
 A: Yes. That's been the practice in downtown Chicago.
 
 
 72
 Tr. at 3428-29 (emphasis added). Other witnesses, too, testified that the City of Chicago was excited about WH's project proceeding. In addition, the jury heard testimony from WH and WH's financial backer that there would be no problem with financing the project. Beyond this, there was no further evidence presented on the contingencies that this project would go forward. From this testimony, a jury could have concluded that the WH project was very likely to go forward, but for the RTA's unreasonable interference with WH's rights.
 
 
 73
 As we noted earlier, the jury, using the method presented by Kelly and the estimate of the value of the raft testified to by Crocker and Higgins, could have concluded that WH's damages were as much as $25,026,028. Instead, the jury awarded WH nearly half a million dollars less than this amount. This might be attributable to the jury's conclusion that, although WH's project was very likely to occur, it was not a certainty. We therefore cannot find an abuse of discretion by the district court in refusing to grant the RTA a remittitur or a new trial on the basis that the jury's award was not rationally supported by the evidence.
 
 
 74
 Finally, the RTA argues that the fact that WH purchased the property seven months prior to the date of the alleged injury for just under $7 million illustrates that the jury's award of $24.5 million is monstrously excessive and that a remittitur is therefore in order. At first glance, this argument has some appeal. However, WH testified that the purchase price was a great bargain and that the window of opportunity to coordinate with the RTA was quite short. Few companies, according to WH, would have been able to take advantage of the situation that WH seized. Moreover, it purchased a one-half interest in the property. This might explain to some degree the discrepancy between the purchase price and the damages that the jury awarded. But more fundamentally, the difference can be explained by what WH's counsel candidly admitted at oral argument was the real issue on damages: How great a dividing line is West Congress Parkway for central Loop real estate? Our examination of the record makes it clear that, throughout this case, the RTA has tried to characterize the property as being far less valuable than the real estate in the central Loop because it is south of West Congress Parkway. Kelly testified that West Congress Parkway is a rigid dividing line as far as the real estate market goes. To illustrate this point, the RTA repeatedly showed a photograph of the property at issue from the north looking south to show the relative dearth of development south of the Loop. On the other hand, WH contended that the North Parcel was merely an extension of the downtown Loop and that crossing West Congress Parkway was not like falling off of a real estate cliff. WH, in showing its picture of the property, viewed it from the south looking north to demonstrate how close the property was to the other magnificent skyscrapers of Chicago's skyline. This difference in paradigms adequately explains the difference in price paid and the jury's award. The North Parcel was on a border between two markets: To the south, there were very few high-rises, and land values were distinctly lower than in the central Loop; to the north, high-rises abounded, and real estate was fetching a tidy sum. The jury was presented with conflicting evidence regarding on which side of the boundary the North Parcel fell; it apparently concluded that West Congress Parkway was not such a rigid dividing line. The jury's factual conclusion is entitled to deference, and we shall not overturn it.
 
 
 75
 Although the award by the jury is quite generous to WH, we do not believe that, given our deferential standard of review, the district court abused its discretion in denying the RTA's motion for a remittitur or a new trial. The damages award is rationally related to the evidence, is not monstrously excessive, and is not born of passion or prejudice.
 
 E. Cross-Appeal
 
 76
 WH also appeals several issues, but they need not detain us long. WH contends that the RTA's counterclaim involving the liquidated damages clause in the Lump Sum Agreement should not have been submitted to the jury. WH urges that the clause is an unenforceable penalty clause rather than a valid liquidated damages clause. We review the district court's determination of whether the clause is an unenforceable penalty de novo. See Lake River Corp. v. Carborundum Co., 769 F.2d 1284, 1290 (7th Cir.1985). Under Illinois law,damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.
 
 
 77
 Telenois, Inc. v. Village of Schaumburg, 256 Ill.App.3d 897, 195 Ill.Dec. 117, 120, 628 N.E.2d 581, 584 (1993) (internal quotation and citation omitted). If the sole purpose of the clause fixing liquidated damages is to secure performance of the contract, the clause will be deemed a penalty and thus unenforceable. Siegel v. Levy Org. Dev. Co., 182 Ill.App.3d 859, 131 Ill.Dec. 340, 342, 538 N.E.2d 715, 717 (1989). To ascertain whether a liquidated damages clause is void because it is a penalty, a court must determine whether "(1) the amount established is reasonable in light of the anticipated or actual loss caused by the breach and (2) a level of difficulty exists in ... establishing the amount of the loss with reasonable certainty." Id.
 
 
 78
 In this case, the parties agreed, as part of the Lump Sum Agreement, that WH would pay the RTA $8,333.33 per working day commencing April 24, 1990 (up to $500,000) that the RTA could not go forward with its reconstruction of the station, unless WH provided a notice that it would proceed with its development by June 13, 1990. The RTA contends that these costs were reasonable estimates to cover costs associated with diverted staff resources and that the actual damages for these diverted resources would be difficult to ascertain. We agree that it would be difficult for the RTA to estimate with precision what the delay costs would be, and we believe that $8,333.33 per day was not, at the time, an unreasonable estimate for the damages the RTA would incur. Moreover, the per diem liquidated damages clause, compared to the many other costs of delay, does not appear to us to have been drafted for the "sole purpose" of ensuring WH's performance--providing the RTA with notice to proceed. See Siegel, 131 Ill.Dec. at 342, 538 N.E.2d at 717 (stating that, when "sole purpose" of the liquidated damages clause is to secure performance of the contract, the clause will be deemed a penalty provision). We see no basis for overturning the jury's verdict in favor of the RTA on counterclaim II.
 
 
 79
 We also believe that WH's appeal from the jury's verdict in favor of the RTA for reimbursement of its contractors' delay costs lacks merit. WH agreed to reimburse the RTA for the delay costs it incurred due to its contractor, Kiewit, and to its consultant, Alfred Benesh & Company. When the RTA was presented with these bills, it asked WH to pay the costs. WH refused because the bills, it thought, were too high. The RTA negotiated with its contractor, and the bill for delay costs was substantially reduced. Nonetheless, WH refused to pay. The record discloses sufficient evidence to support the jury's conclusion that WH breached its agreement to reimburse the RTA for these costs and that the RTA was entitled to the damages. Consequently, we affirm the jury's verdict in favor of the RTA on counterclaim I.
 
 Conclusion
 
 80
 For the foregoing reasons, we affirm, in its entirety, the judgment of the district court.
 
 AFFIRMED.APPENDIX
 
 81
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 *
 Honorable Walter J. Cummings and Honorable Joel M. Flaum took no part in the decision or consideration of this petition for rehearing en banc
 
 
 [1]
 The case in the district court originally involved a significantly larger parcel of property, which included a parcel of land that the parties refer to as the "North Parcel." The North Parcel is a 95,156 square foot piece of property bordered by West Congress Parkway, West Harrison Street, South LaSalle Street and South Financial Plaza. Of the 95,156 square feet, W/H Limited Partnership No. 17 owns a 50% interest in 72,694 square feet and owns an easement over the remaining 22,462 square feet, which is owned by the City of Chicago. The entire parcel of property, both the North Parcel and the South Parcel (the 175,377 square feet of property between Harrison Street on the north and Polk Street on the south), total 270,533 square feet. See map appended to this opinion. The jury found that WH was estopped from claiming damages for the South Parcel. WH has not appealed this jury verdict
 
 
 [2]
 Under the Stipulation, the trustee also agreed "not to unreasonably interfere with the [relocatable] easement rights of the RTA." R.315, Ex.D at 15
 
 
 [3]
 WH is the beneficial owner of a trust whose corpus includes, among other things, a 50%, co-tenancy interest in the North Parcel. In 1983 Harris Bank, as trustee under trust number 42343, acquired the other 50%, co-tenancy interest in the North Parcel from Penn Central Corporation, the successor to Northern Indiana. Harris Bank asserted a claim for inverse condemnation against the RTA arising from the LaSalle Street Station renovation. Harris Bank's claim was separated from American Bank's claims before trial and is still pending before the district court. The district court granted WH's motion for Rule 54(b) certification because there was no just reason for delay
 
 
 [4]
 In order to provide a notice to proceed that was satisfactory to the RTA, the RTA required WH to have an executed construction contract and a posted construction bond for its proposed revised plans. WH's plans had to be approved by the RTA. To attempt to obtain this approval, WH worked closely with the RTA's engineers and staff to develop a workable coordinated plan. As the July 13 deadline approached, however, the RTA's chief engineer had not approved WH's revised plan. Without this approval, WH could not sign a construction contract or obtain a construction bond. Without these, WH could not give the RTA the requisite notice to proceed by the contemplated date, July 13. In addition, many other hurdles were placed in WH's path during the hiatus period. Some of these hurdles, according to WH, unreasonably interfered with their development plans. For example, the RTA required WH to indemnify it for any possible losses in funding from the governmental agency that was helping to fund the LaSalle Street Station's renovation. The RTA also insisted that WH be the one primarily financially responsible for building and maintaining a ventilation system under the raft. This system would prevent the accumulation of diesel fumes in the station. The RTA also insisted throughout much of the parties' negotiations that WH use the RTA's contractor, Kiewit, for all the joint work, for which the RTA insisted that WH would pay, and for some of the work that was solely related to WH's infrastructure. The RTA changed its position on this issue somewhat, finally agreeing that WH would pay for all the joint infrastructure work and would use Kiewit to do it, but that WH could use its own contractor for its own infrastructure. Finally, WH contends, the brief length of time to which the RTA agreed to stop its construction, because so brief, interfered unreasonably with WH's development rights
 
 
 [5]
 We also must reject the RTA's contention that the district court should have submitted the issue of whether the RTA had an affirmative defense to WH's claims under the 1851 contract. We do not believe the district court abused its discretion in not submitting the 1851 contract defense issue to the jury because, although the RTA's rights were derived from the 1851 contract, its obligations and duties to WH, as successor to Rock Island, were governed by the 1984 Judgment Order
 
 
 [6]
 WH did not present any extrinsic evidence of its own to clarify the meaning of the clause; the attorney who had represented the bankruptcy trustee in his negotiations with the RTA had died prior to the trial. WH did cross-examine the RTA's witness vigorously, however
 
 
 [7]
 WH's counsel asked Neal:
 Q: And the language in that provision [the indemnity clause] is not--it includes but is not limited to third parties' property, correct?
 A: That is--the language is not limited, that's correct.
 Q: Pardon me?
 A: Yes.
 Q: Did you discuss one way or the other [with Wiss, the trustee's counsel] whether the RTA was going to be obligated to indemnify the owners?
 A: No.
 Q: --one way or the other?
 A: No.
 Tr. at 2772-73.
 
 
 [8]
 For purposes of this discussion, the RTA does not refer to Metra and the RTA collectively, but rather to only the RTA
 
 
 [9]
 See, e.g., Hill v. Ben Franklin Savs. & Loan Ass'n, 177 Ill.App.3d 51, 126 Ill.Dec. 462, 466, 531 N.E.2d 1089, 1093 (1988) (noting that "the general rule in Illinois is that an owner of land is competent to render an opinion as to the value of his land"); American Nat'l Bank & Trust Co. v. City of North Chicago, 155 Ill.App.3d 970, 108 Ill.Dec. 534, 536, 508 N.E.2d 1111, 1113 (1987) (stating the same rule in case involving beneficial owner of land trust)
 
 
 [10]
 Higgins testified that WH had reached an agreement with the Cacciatore Group, the beneficial interest owner of the remaining 50% interest in the North Parcel. Under that agreement, WH would make two payments to the Cacciatore Group, totaling between $6.1 million and $6.5 million. One of the payments would be due after the coordination efforts of WH and the RTA were successfully completed, and the second payment would come due after WH had completed the raft
 
 
 [11]
 Higgins testified that, because WH had already expended the costs of acquiring its 50% interest in the North Parcel, such cost would not fall into the category of costs yet to be expended to develop the raft. Consequently, Higgins stated, it was inappropriate to deduct that amount when calculating WH's damages
 
 
 [12]
 Kelly, in performing his appraisal, considered the entire parcel of property, both the North and South Parcels, which was at issue in the district court proceeding. The two parcels together, according to Kelly, amounted to approximately 270,000 square feet: 175,377 square feet (South Parcel), 72,694 square feet (WH's fee-simple interest in the North Parcel), and 22,462 square feet (the City of Chicago's interest in the North Parcel over which WH had an easement)
 
 
 [13]
 On cross-examination, WH's counsel asked Kelly:
 Q: And in your--in your valuation of the subject property, you understood that there was a part of the property on the northern end near--between Congress and Harrison that was owned by the City of Chicago but which the owners had an easement right across?
 A: That's correct.
 Q: And you included in your market value analysis the square footage of the easement parcel, correct?
 A: Yes. In my opinion, that parcel could be used to create what's known as bonus values and give you a higher density for the purpose of zoning.
 Tr. at 3429. Additionally, throughout his testimony, Kelly, in choosing similar properties to compare to WH's parcel, considered whether the comparison properties were superior or inferior to WH's parcel in terms of size based on an area of 270,000 square feet for WH's parcel. This figure includes the square footage of WH's easement on the North Parcel.
 
 
 [14]
 The fact that the jury awarded more in damages than WH asked for in closing argument is not itself dispositive of an error in the award of damages. Rule 54(c) provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Fed.R.Civ.P. 54(c); accord Dresser Indus., Inc. v. Gradall Co., 965 F.2d 1442, 1447 (7th Cir.1992)
 
 
 [15]
 ($550 per square foot (value of the completed raft) minus $287 per square foot (total cost to build raft)) X (72,694 square feet (size of WH's property interest) + 22,462 square feet (City of Chicago's property interest over which WH has an easement)) = $25,026,028
 
 
 [16]
 In addition to arguing that the method for determining damages was flawed, the RTA contends that WH's witnesses who testified as to the value of the property should not have been allowed to testify on that subject because they were not experts. However, as we have already noted, supra note 9, Illinois law provides that owners of property, even the beneficial owners of land, are competent to testify to the value of their property. We do not believe that the RTA has rebutted the presumption that Crocker and Higgins were competent to testify about the property's value
 
 
 [17]
 Similarly, according to the RTA, the award does not take account of the time value of the money involved. The benefits to be reaped from WH's project would not have accrued until at least 28 months after the alleged injury. Because the RTA did not raise this issue of present value before the district court, it is waived. See Kensington Rock Island LLP v. American Eagle Historic Partners, 921 F.2d 122, 125 (7th Cir.1990)